456 So.2d 626 (1984)
Jessie Rose PITRE
v.
AETNA INSURANCE COMPANY, INC., et al.
No. 83-C-1771.
Supreme Court of Louisiana.
September 10, 1984.
Rehearing Denied October 4, 1984.
Ronald R. Thompson, Baton Rouge, for applicant.
Bruce A. Gaudin, Ledet & Gaudin, Opelousas, for respondents.
LEMMON, Justice.
This wrongful death action arises out of an accident in which the car driven by Widnay Pitre ran off the highway, traveled 300 feet on the shoulder of the road, struck a guardrail protecting a bridge abutment, and careened across the road before falling into a ditch. The trial court held the Department of Transportation and Development liable on the basis that a two-to-three-inch dropoff from the paved portion of the highway to the shoulder created an unreasonably dangerous risk of harm. The court of appeal affirmed. 434 So.2d 191. We granted certiorari to review the correctness of the judgments. 440 So.2d 754. After reviewing the record, we conclude that any difference in elevation between the roadway and the shoulder was not a *627 legal cause of the accident. We accordingly reverse.
The accident occurred on U.S. Highway 167 between Opelousas and Ville Platte at about 10:20 p.m. on New Year's Eve in 1979. Mr. and Mrs. Pitre had left Opelousas at about 8:00 p.m., had attended a party at a friend's house for about two hours, and had stopped briefly at a nightclub before continuing toward Ville Platte.
The highway in the area of the accident consisted of a two-lane asphaltic concrete roadway, which had recently been overlaid.[1] There was an aggregate surface core shoulder, about six to eight feet in width. Northbound traffic on the highway encountered a gradual curve to the left just before the bridge where the accident occurred, as shown on the following photograph:

The curve was marked by a warning sign which displayed an arrow pointing to the left and an advisory speed of 45 miles per hour. The bridge abutments on the south side were protected by guardrails. The abutments were also marked by one-foot by three-foot black-and-white delineators. Another delineator was placed at the beginning of the guardrail. The two delineators, the guardrail on the east shoulder, and the bridge are shown on the following photograph:
*628 
Mrs. Pitre testified that her husband had been driving north about 55 miles per hour (the posted speed limit) as they entered the curve before the bridge. A car with bright lights approached them, and the right wheels of their car went off the roadway onto the shoulder. She did not know the distance or the time lapse between the point where the car left the roadway and the point where they "hit something". After the collision on the right (east) shoulder adjacent to the northbound lane, the car careened across the roadway and went off the embankment into a ditch.
A state trooper, called to the scene immediately after the accident, found the car in the ditch on the west side of the highway.[2] After placing the Pitres in an ambulance, the trooper inspected the area and found tire tracks on the newly-resurfaced east shoulder. He measured the tracks, which extended for 300 feet along the shoulder from the point where the car left the roadway to the point where the car hit the guardrail just before the bridge. He did not notice anything unusual about the shoulder.
The following morning, two of the Pitres' sons visited the scene. One son testified that tire tracks on the shoulder extended in an uninterrupted line for an estimated 150 feet from the bridge rail (at which point the tracks were six inches from the roadway) to a driveway (at which point the tracks were three feet from the roadway), where the markings were crossed by other tracks.[3] The guardrail contained a dent at *629 the point where the tracks on the east shoulder ended, and the guardrail on the west shoulder was badly damaged at the point where the car went into the ditch. The brothers also noticed evidence of the car's crossing the highway between the points of damage on the two guardrails.
One brother testified that the level of the shoulder was "maybe a couple of inches... probably somewhere between two and three inches" lower than the roadway. The second brother simply stated that he noticed that the shoulder was lower than the roadway. Neither brother related the drop-off to the point where the car left the roadway or to the point where the car struck the guardrail, or to any particular area between the two points.
The evidence thus established that the car left the roadway at a point about 300 feet from the bridge, that the driver never attempted reentry while traveling in a relatively straight line on the shoulder (described as "firm and smooth" by one of Pitre's sons), and that the car struck the guardrail on the east side with sufficient velocity to cause it to careen across the highway and to jump the guardrail on the west side. These facts and circumstances established by the evidence dictate the legal conclusion that any difference in elevation between the roadway and the shoulder did not contribute to the causation of this accident.
The difference in elevation certainly did not cause the car to leave the highway (which had a white stripe marking the eastern edge and a sign warning of the curve). After the car went onto the shoulder and the driver regained control (as he apparently did), the difference in elevation did not cause the driver to again lose control, because the driver did not attempt reentry onto the highway, and none of the wheels of the car again touched the edge of the roadway until after the collision. Moreover, even if the driver was apprehensive of the dropoff (assuming he was aware of the dropoff), such apprehension did not cause the accident, because the driver had ample opportunity to bring the car to a safe stop on the shoulder before he reached the well-marked bridge area. Finally, since the shoulder in the area was hard and even, no defect in the shoulder can be ascribed as a cause of the accident.
Prudent behavior for a motorist who inadvertently drives off the paved roadway onto the shoulder is first to reduce speed and then to attempt a gradual reentry after he has regained control of the vehicle. The motorist in this case, upon leaving the roadway, had adequate warning of the bridge 300 feet ahead and had ample opportunity to reduce his speed and to make a controlled gradual reentry, or even to bring the vehicle to a complete stop before reentering. However, he apparently chose to remain on the shoulder without significantly reducing his speed until he passed the first delineator and struck an obvious and prominent guardrail.
The evidence in this record, viewed in the light most favorable to the prevailing party in the trial court, does not reasonably support a conclusion that any failure of maintenance by the Department contributed to the causation of this accident.
Neither was any improper placement of the delineators causally related to this accident, as plaintiffs contend. Highway regulations require markers to be placed in line with the inner edge of an object adjacent to the highway. The first delineator was placed at the beginning of the guardrail, outside and just above the rail. The second delineator, although outside the guardrail, was placed in line with the inner edge of the bridge abutment (which arguably was the "object" required to be marked). Thus, the delineators, even if at slight technical variance with the regulations, adequately served to provide a warning to motorists approaching the bridge abutment. The placement of the conspicuous and plainly *630 discernible delineators cannot be said to have misled motorists into believing it was safe to ride along the shoulder in the area.
Accordingly, the judgments of the lower courts are reversed, and judgment is rendered in favor of the Department. All costs are assessed to plaintiffs.
WATSON, J., dissents and assigns reasons.
WATSON, Justice, dissenting.
After inadvertently leaving the paved portion of the roadway, Widnay Pitre attempted to return to the pavement. As he prudently attempted a gradual reentry, he struck an unmarked bridge railing only six inches from the highway. Compare Rue v. State, Dept. of Highways, 372 So.2d 1197 (La., 1979). Absent the dangerous condition of the shoulder, there is little question that Mr. Pitre would have been able to reenter the highway before striking the bridge railing. The situation here is similar to that in LeBlanc v. State, 419 So.2d 853 (La., 1982) where a motorist inadvertently went off on the shoulder of the road because of oncoming traffic. In attempting a gradual reentry to the highway, Widnay Pitre did exactly what is recommended by driving experts. See LeBlanc v. State, supra, and Sinitiere v. Lavergne, 391 So.2d 821 (La., 1980).
The excessive drop-off to the shoulder was a cause-in-fact of the Pitre accident. The Department had a duty to maintain the shoulder with a drop-off of less than two inches to protect Widnay Pitre against the risk he encountered when he inadvertently drove onto the dangerously low shoulder. The two markers for the bridge were placed on the outer edge of the obstruction rather than the inner edge as mandated by the Department's manual. The daylight photographs in the majority opinion do not depict the scene as it appeared to Pitre at night. The placement of the bridge markers may well have contributed to the accident, inducing Widnay Pitre to believe that he was within a zone of safety rather than six inches away from it. The Department was clearly negligent; the shoulder and bridge markers were defective and presented an unreasonable risk of injury.
The trial court and the court of appeal did not err in concluding that the negligence of the Department was a substantial factor in the Pitre accident and that the Department is liable for the resulting damages. Dixie Drive It Yourself System v. American Beverage Company, 242 La. 471, 137 So.2d 298 (1962); LeBlanc v. State, supra. The judgment of the trial court on the issue of liability is not clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La., 1978).
Therefore, I respectfully dissent.
NOTES
[1] The construction project, which included a four and one-eighth-inch roadway overlay as well as shoulder surfacing, was accepted by the Department on November 20, 1979.
[2] The trooper noticed the odor of alcohol on Mr. Pitre's breath and requested the hospital to obtain a blood sample. The crime laboratory analyst reported that the blood alcohol content was 0.15%. However, the Department did not introduce any expert evidence to establish the meaning of the test results or the relationship between the alcohol content of a person's blood and the impairment of the person's driving ability. We therefore disregard, as did the trial judge, the evidence concerning the blood alcohol test. We further note that the act of driving while intoxicated does not itself cause accidents; it is the conduct influenced by intoxication which causes accidents.
[3] The first brother did not mention any tracks south of the driveway (at which point the tracks were three feet from the roadway). The second brother described the tracks from the point where the car veered off the road to the point of contact with the guardrail. He estimated that the distance between the rail and the driveway, where the tracks were crossed by other tire marks, was 100 feet and that the total length of the tracks was 150 feet.

Because the trooper actually measured the tire tracks on the shoulder from the point where the car left the road to the point of contact with the guardrail, we accept the trooper's testimony that the distance was 300 feet.