648 So.2d 1361 (1994)
Karen T. GUIDROZ and Gerald Guidroz
v.
STATE of Louisiana, THROUGH the DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT.
CA 94 0253.
Court of Appeal of Louisiana, First Circuit.
December 22, 1994.
Rehearing Denied February 8, 1995.
*1363 Larry S. Bossier, Grosse Tete, Richard J. Ward, Jr., Maringouin, for plaintiffs/appellees, Karen and Gerald Guidroz.
Lon Norris, Baton Rouge, for defendant/appellant State of La.
Before CRAIN, FOIL and WHIPPLE, JJ.
WHIPPLE, Judge.
This is an appeal by defendant, the State of Louisiana through the Department of Transportation and Development (the DOTD), from a judgment in favor of plaintiffs, Karen T. Guidroz and Gerald Guidroz. Plaintiffs have answered the appeal. For the following reasons, we amend and affirm the judgment.

FACTS AND PROCEDURAL HISTORY
This litigation arises out of an automobile accident which occurred on June 7, 1989, at approximately 7:30 p.m. on Louisiana Highway 77 (La. 77) between Grosse Tete and Rosedale. La. 77 was in the exclusive care, custody and control of the DOTD. While traveling in a northerly direction on La. 77, Karen Guidroz, who was driving a 1988 Chevrolet Sprint, was confronted with a vehicle approaching in the opposite direction which was being operated by an unknown driver with its left tire on the center line. Ms. Guidroz slowed her vehicle and steered to the right to afford the oncoming vehicle additional room. When Ms. Guidroz moved her vehicle over to the right, her vehicle traveled onto the shoulder. At this location, the lane of travel in which Ms. Guidroz was driving was less than half the width of the eighteen-foot roadway, the edge of the roadway was uneven and there was a significant drop-off between the paved portion of the roadway and the shoulder, measuring four to six inches. The shoulder of the road consisted of dirt, gravel and shell, and was rounded and sloped towards the ditch.
Because of the difference in the elevation of the roadway and shoulder, the undercarriage of Ms. Guidroz's vehicle was scraping against the roadway, and Ms. Guidroz stated that her vehicle kept pulling to the right toward the ditch and trees on the side of the roadway. According to Ms. Guidroz, she believed that if she did not keep her vehicle from pulling to the right, she would get into a wreck. Thus, Ms. Guidroz attempted to pull her vehicle back onto the roadway, and on her second or third attempt, her vehicle reentered the roadway, traveled across both lanes and struck a tree on the opposite side of the roadway. As a result of the accident, Ms. Guidroz suffered serious and debilitating personal injuries, including severe facial injuries.
Thereafter, Ms. Guidroz and her husband, Gerald, instituted this suit against the DOTD. The matter was tried on December 21 and 22, 1992. By judgment dated July 22, 1993, the trial court found that the accident was caused by the defective condition of La. 77 and by the comparative negligence of Ms. Guidroz, and apportioned fault seventy-five percent to the DOTD and twenty-five percent to Ms. Guidroz. The court awarded damages to plaintiffs, for which the DOTD *1364 was liable for seventy-five percent, as follows:

Past Medical Expenses $ 80,569.08
Future Medical Expenses 40,000.00
Economic Loss on returning to work
in seven years 76,767.48
Non-market skills 13,847.27
Physical and Mental Pain (past, present
and future) 450,000.00
Loss of Consortium (Gerald Guidroz) 30,000.00
Loss of 1988 automobile 7,250.00
 ___________
TOTAL DAMAGES $698,433.83

From this judgment, the DOTD appeals, alleging that the trial court erred: (1) in finding that Karen Guidroz was only 25% at fault; (2) in not assigning any percentage of fault to the driver of the "phantom" vehicle; (3) in finding that Karen Guidroz's loss of earning capacity was caused by the injuries sustained in the June 7, 1989 accident; (4) in awarding Gerald Guidroz $30,000.00 for loss of consortium; and (5) in awarding excessive general damages in the amount of $450,000.00.
Plaintiffs answered the appeal, averring that the trial court erred: (1) in finding that Karen Guidroz was 25% at fault and in failing to find that the DOTD was 100% at fault; and (2) in failing to award legal interest in accordance with LSA-C.C.P. art. 1921.

FAULT OF THE PARTIES

(DOTD's Assignment of Error No. 2; Plaintiffs' Assignment of Error No. 1)
Plaintiffs allege that the trial court erred in finding that Karen Guidroz was at fault in causing the accident, and the DOTD alleges that the trial court erred in not assigning any fault to the "phantom" driver, whose actions were also a cause of the accident.[1]

Fault of Karen Guidroz
It is well settled that motorists have a duty to maintain control of their vehicles. Cashio v. State, Department of Transportation and Development, 518 So.2d 1063, 1065 (La.App. 1st Cir.1987). Prudent behavior for a motorist who inadvertently drives off the paved roadway onto the shoulder is first to reduce speed and then to attempt a gradual reentry after the motorist has regained control of the vehicle. Pitre v. Aetna Insurance Company, Inc., 456 So.2d 626, 629 (La.1984).
In the instant case, Ms. Guidroz attempted to maneuver her vehicle to the right of her lane of travel in an effort to afford additional room to an oncoming vehicle, with its left tire on the center line. At that point, Ms. Guidroz's vehicle left the roadway and traveled onto the shoulder, the elevation of which measured approximately four to six inches below that of the roadway. Ms. Guidroz's reaction to the situation was to immediately attempt to reenter the roadway. According to Ms. Guidroz, because her vehicle was pulling to the right, she steered "real hard" to the left and had to make two or three attempts before reentering the roadway. When her vehicle did reenter the roadway, it traveled across both lanes, exited the other side of the roadway and struck a tree.
Duaine Evans, a traffic engineering and accident reconstruction expert called by plaintiffs, testified that as soon as Ms. Guidroz's front tire reentered the roadway, Ms. Guidroz was oversteering, and this caused the vehicle to shoot across the roadway.
Gene Moody, an expert in civil engineering who was also called to testify by plaintiffs, opined that driver error was a contributing cause of the accident. Moody explained that a driver who runs off the roadway should brake and then reenter the roadway safely. In the instant case, he considered the driver error to be oversteering by Ms. Guidroz. Furthermore, Dr. Jerry Householder, the DOTD's expert engineer, testified that Ms. Guidroz's failure to slow down before attempting to reenter the roadway was a cause of the accident. In support of their contention that the trial court erred in finding that Ms. Guidroz was negligent and that her negligence was a cause of the accident, plaintiffs note the testimony of Duaine Evans in which he opined that Ms. Guidroz's "reflex action" in steering to the left was not significant *1365 driver error, because Ms. Guidroz was faced with an imminent hazard.
After weighing and evaluating all of the evidence, the trier of fact is free to accept or reject the opinions expressed by experts. Hoyt v. State Farm Mutual Automobile Insurance Company, 623 So.2d 651, 659 (La. App. 1st Cir.), writ denied, 629 So.2d 1179 (La.1993). Moreover, where there is a difference in opinion between experts on a factual matter, it is within the trial court's discretion to favor one opinion over another. McDonald v. Illinois Central Gulf Railroad Company, 546 So.2d 1287, 1295 (La.App. 1st Cir.), writs denied, 551 So.2d 1340 (La.1989). Considering the lay and expert testimony, and the record as a whole, we cannot conclude that the trial court erred in finding that Ms. Guidroz's actions constituted driver error. Thus, the trial court did not err in concluding that Ms. Guidroz was at fault in causing the accident.

Fault of the "Phantom" Driver
The DOTD contends that the trial court erred in failing to find any fault on the part of the driver of the vehicle in the opposing lane of travel, i.e. the phantom driver. The trial court is authorized to assign fault to a negligent person, whether a party or not, "[if] appropriate." LSA-C.C.P. arts. 1812(C)(2) and 1917; Devereux v. Allstate Insurance Company, 557 So.2d 1091, 1095 (La.App. 2nd Cir.1990). The language of LSA-C.C.P. art. 1812(C) is clear in its intent to leave the determination of whether the fault of a non-party should be considered to the trial judge's discretion. Vascocu v. Acme Cement Products, Inc., 610 So.2d 258, 264 (La.App. 3rd Cir.1992), writ denied, 615 So.2d 341 (La. 1993).
Contrary to the contention of the DOTD that the phantom driver involved in this case had "moved into [Ms. Guidroz's] lane which caused her to swerve to the right," the evidence of record demonstrates that the left tire of the phantom driver's vehicle was riding the center line. Upon seeing the approaching vehicle on the center line, Ms. Guidroz was not forced to "swerve to the right." Instead, it is clear from her testimony that she slowed down and attempted to maneuver her vehicle to the right-hand portion of her lane of travel.
Expert testimony established that the center line of La. 77 at this location was not actually located in the center of the roadway, and as a result, Ms. Guidroz's lane of travel measured only seven feet, nine inches of this eighteen-foot wide roadway. Moreover, the edge of the roadway was broken off and very jagged. These conditions caused Ms. Guidroz's vehicle to drop off onto the shoulder.
Neither Moody nor Evans, plaintiffs' experts, were of the opinion that the actions of the phantom driver were a contributing cause of the accident. Moreover, while Dr. Householder concluded that the actions of the phantom driver were a cause of the accident, he based this conclusion on the assumption that the vehicle "got out of [its] lane" and "crossed over the middle line." As stated above, the record does not support this assumption, but instead establishes that the vehicle's left tire was merely riding on the center line. Cf. Perez v. State, Department of Transportation and Development, 578 So.2d 1199, 1202, 1205 (La.App. 4th Cir.), writ denied, 581 So.2d 706 (La.1991).
Considering the foregoing and the record as a whole, we cannot conclude that the trial court erred in failing to assign any fault to the phantom driver for its actions herein.

APPORTIONMENT OF FAULT

(DOTD's Assignments of Error Nos. 1 & 2: Plaintiffs' Assignment of Error No. 1)
As set forth above, the DOTD contends that the trial court erred in apportioning only twenty-five percent fault to Ms. Guidroz and in failing to apportion any fault to the phantom driver; and plaintiffs contend that the trial court erred in failing to apportion one hundred percent fault to the DOTD.[2]
*1366 In Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967, 974 (La. 1985), the Louisiana Supreme Court set forth five factors to be considered in apportioning fault: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) the extent of the risk created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought.
A determination by the trier of fact as to allocation of fault is a factual finding which can not be overturned in the absence of manifest error. McIntyre v. Saunders, 554 So.2d 1371, 1373 (La.App. 1st Cir.1989), writ denied, 558 So.2d 583 (La.1990). In reviewing the trial court's factual findings, this court employs a manifest-error, clearly wrong standard. This court may not reverse a factual finding of the trial court unless we find: (1) a reasonable factual basis for the trial court's finding does not exist in the record, and (2) the record establishes that the finding is clearly wrong. Thus, the issue to be resolved by this court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993).
As stated above, when faced with an approaching vehicle with its left tire on the center line, Ms. Guidroz slowed her vehicle and attempted to move to the right-hand portion of her lane of travel. Ms. Guidroz did not intend to traverse the shoulder. Moreover, Ms. Guidroz's actions in maneuvering her vehicle to the right may not have resulted in her traversing the shoulder but for the narrowness of her lane of travel and the broken-off, jagged condition of the edge of the roadway. Ms. Guidroz's actions were an attempt on her part to allow the oncoming vehicle more room to avoid any possibility of a collision. There was no evidence that Ms. Guidroz was traveling in excess of the posted speed limit at the time.
We further note that once Ms. Guidroz's vehicle left the roadway and traversed the shoulder, she was confronted with a situation which required her to react quickly, due to the condition of the shoulder. According to the testimony of Ms. Guidroz, while her vehicle was straddling the roadway and the shoulder, the undercarriage of the vehicle was scraping the roadway and the vehicle began pulling to the right, toward the ditch and trees.
Gene Moody likewise testified that the dragging of Ms. Guidroz's vehicle on the pavement and the rounded condition of the shoulder caused Ms. Guidroz's vehicle to be pulled to the right, toward the ditch. Thus, he explained, Ms. Guidroz had to introduce steering to the left just to maintain a straight path.
Duaine Evans also testified that the difference in elevation between the roadway and the shoulder, the dragging of the vehicle on the roadway and the slope of the shoulder were all conditions which tended to pull Ms. Guidroz's vehicle off the roadway to the right. He opined that it would have been "virtually impossible" for a driver of a small-sized vehicle, such as Ms. Guidroz's, to "ride" a drop-off of this nature and that the average driver would not have been able to maintain his or her position on that shoulder for any significant distance while attempting to slow down.
Evans further opined that if Ms. Guidroz had attempted to slow down and maintain her position on the shoulder, there was a good possibility that her vehicle would have been pulled off the roadway and would have flipped. He stated that Ms. Guidroz was faced with a situation which most drivers would have perceived to be an "[im]minent hazard," to which she responded by steering to the left, which he characterized as almost a reflex action.
Moreover, although Dr. Householder opined that there was no impending situation which necessitated that Ms. Guidroz reenter the roadway and that she should have slowed her vehicle before such an attempt, he admitted that in this situation, applying her brakes would have made steering more difficult for Ms. Guidroz.
*1367 An implicit necessity for the functional use of a shoulder is a connection between the roadway and shoulder that allows for safe, gradual movement from one to the other. Sinitiere v. Lavergne, 391 So.2d 821, 825 (La.1980). La. 77, at the site of the accident, had a very jagged, broken-off edge and a difference in elevation between the roadway and shoulder measuring four to six inches. All of the experts agreed that a six inch drop-off presented a hazardous situation.
Gene Moody testified that the DOTD's roadway maintenance manual provides that an edge drop-off of three inches in depth should be scheduled for repair and a drop-off measuring five inches in depth should be scheduled for emergency repair. Moody opined that there was a "gross lack of maintenance" and that a shoulder in this condition would develop only from "years of neglect." In fact, the shoulder had eroded to such an extent that three layers of asphalt concrete on the roadway could be seen, which Moody opined was probably down to the original roadway constructed in 1943. Evans similarly testified that there had been no maintenance performed on the shoulder for a long time, possibly years, prior to the accident.
Despite the fact that the roadway was in violation of DOTD standards and despite routine inspections of the roadway every two weeks, the DOTD failed to repair the condition of the shoulder in question. The DOTD's failure to repair this shoulder, which by its own standards should have been scheduled for emergency repair, created a great risk of accidents occurring in the very manner in which Ms. Guidroz was injured.
In support of its contention that the trial court committed manifest error in its apportionment of fault, the DOTD relies on this court's opinion in Brooks v. City of Baton Rouge/Parish of East Baton Rouge, 558 So.2d 1177 (La.App. 1st Cir.), writ denied, 566 So.2d 982 (La.1990). However, we find Brooks clearly distinguishable from the present case. In Brooks, this court reapportioned the plaintiff's fault to increase her fault from 15% as assigned by the trial court to 50%, where the plaintiff had strayed from the roadway due to her own inattention. Moreover, as stated in the opinion, there was no evidence of a need for the plaintiff to proceed in such a hasty fashion in attempting to reenter the roadway, which was elevated approximately two and one-half to three and one-half inches above the shoulder. Brooks, 558 So.2d at 1179-1180.
In the instant case, Ms. Guidroz's traveling onto the shoulder was precipitated, at least in part, by the narrowness of her lane of travel, as well as the jagged, broken-off edge of the roadway. Moreover, the effect of the drop-off, which was substantially more severe in the instant case, of pulling Ms. Guidroz's vehicle off the roadway to the right necessitated that she act hastily to be able to, at the very least, maintain her position on the shoulder.
Considering the foregoing, we cannot conclude that the trial court was manifestly erroneous in its apportionment of fault of 75% to the DOTD and 25% to Ms. Guidroz. These assignments of error lack merit.

QUANTUM

(DOTD's Assignments of Error Nos. 4 & 5)
Before a court of appeal can disturb an award made by a trial court, the record must clearly reveal that the trier of fact abused its much discretion in making the award. LSA-C.C. art. 2324.1; Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La. 1976). The initial inquiry must always be directed at whether the trial court's award for the particular injuries and their effects upon this particular injured person is a clear abuse of the trier of fact's much discretion. Reck v. Stevens, 373 So.2d 498, 501 (La.1979). In Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), the Louisiana Supreme Court stated:
[T]he discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable *1368 trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.

Ms. Guidroz's General Damage Award
The DOTD contends that the trial court abused its vast discretion in awarding general damages to Ms. Guidroz in the amount of $450,000.00. We disagree.
As a result of the June 7, 1989 accident, Ms. Guidroz required emergency care and treatment and was initially examined by Dr. William Dimattia, an otolaryngologist, in the emergency room. Dr. Dimattia diagnosed Ms. Guidroz as suffering from severe facial injuries, referred to as Le Fort III. These injuries resulted from Ms. Guidroz's face striking the steering wheel. Dr. Dimattia explained that practically every major bone in Ms. Guidroz's upper face was broken. Ms. Guidroz sustained a trimalar fracture on the right, consisting of a fracture of the lateral orbital rim, the inferior orbital rim and the lateral maxillary sinus, all around the right eye. Ms. Guidroz also sustained a fracture to the right zygomatic arch or cheekbone, as well as a fracture to the nasal bone.
On the left, Ms. Guidroz sustained a fracture to the floor of the orbit, referred to as a "blowout fracture." The maxillary rim, which is the bone located above the upper teeth, was also fractured. In addition to these fractures, Ms. Guidroz sustained multiple lacerations of her face and lost numerous teeth. According to Ms. Guidroz, immediately following the accident, she experienced "excruciating pain."
Dr. Dimattia performed surgery on June 12, 1989, which involved complete restructuring of the facial bones. This surgery required wiring of the fractured bones and placement of dental arch bars over the upper jaw, which necessitated that Ms. Guidroz be placed on a soft food diet. However, Ms. Guidroz testified that her mouth hurt too badly to eat even soft foods. The wires remained in her face for almost two months and were removed on August 10, 1989.
Following the initial surgery, Ms. Guidroz developed temporomandibular joint (TMJ) pain, which minimized her ability to open her mouth. Ms. Guidroz was treated by Dr. Charles Hornsby, Jr., an oral and maxillofacial surgeon, for TMJ problems. Dr. Hornsby performed surgery on August 24, 1990, to correct this problem, and despite improvement in Ms. Guidroz's ability to open her mouth, she continues to experience pain. Regarding the joint pain, Ms. Guidroz testified that yawning, coughing, sneezing, laughing and crying are all very painful for her, and she has problems with her jaw dislocating.
Dr. Hornsby opined that she may require additional joint surgery on the right side in the future to alleviate or reduce her pain. If the surgery contemplated by Dr. Hornsby is performed, Ms. Guidroz will be required to wear a splint for one year following the surgery, during which time she will be placed on a non-chewing diet. Dr. Hornsby opined that Ms. Guidroz will never again enjoy 100% function of the joint.
Also following the initial surgery to restructure her facial bones, Ms. Guidroz developed a depression over the zygomatic arch, which resulted in a dimpling effect of her skin over the cheekbone. Ms. Guidroz was treated for this injury by Dr. Roy Brabham, Jr., a plastic and reconstructive surgeon. A CT scan revealed a fracture present in the middle portion of the zygomatic arch that was still mal-aligned or caved in. Dr. Brabham performed surgery on February 8, 1991, to repair the zygomatic arch, placing small metal plates in the caved-in area. To perform this surgery, Dr. Brabham made an incision from one ear, across the top of Ms. Guidroz's head, to the other ear, and then peeled down the soft tissue to expose the zygomatic arch. Ms. Guidroz testified that as a result of this surgery, she has no feeling on the top of her head, where the incision was made by Dr. Brabham, and that one area of the incision produces a shocking sensation when touched.
Following the surgery, further scarring occurred at this site, which resulted in additional tethering of the skin over this area. According to Dr. Brabham, this additional *1369 tethering will require further surgical intervention to correct, and he has advised Ms. Guidroz to proceed with this surgery.
As a result of loss of and damage to her teeth from the accident, Ms. Guidroz required the fitting of several crowns and a seven-unit bridge under the care of Dr. Galen Meyers, a dentist. Dr. Meyers explained that because of Ms. Guidroz's limited ability to open her mouth, she suffered considerable discomfort in the placement of the crowns, especially those in the back of her mouth. Moreover, according to Dr. Meyers, Ms. Guidroz will probably need a bridge on the lower right side following the jaw surgery to be performed by Dr. Hornsby.
Ms. Guidroz testified that since the accident, she has suffered from a constant stinging sensation on the right side of her face, and she has not been able to chew on the right side of her mouth. Also, she stated that prior to the accident she was very involved in sports, and she is no longer able to enjoy this pastime.
In addition to these physical injuries, Ms. Guidroz developed psychological problems following the accident. Dr. Christine Angelloz, a clinical psychologist who has been treating Ms. Guidroz since shortly after the accident, diagnosed Ms. Guidroz as suffering from post-traumatic stress disorder with severe concomitant depression and a chronic pain problem. Ms. Guidroz's symptoms include headaches, insomnia, nightmares, feelings of tension and panic, depression, inability to relax, sexual problems, inability to enjoy herself and shyness.
Dr. Philip Rowden, a psychiatrist who has also been treating Ms. Guidroz, similarly diagnosed Ms. Guidroz as suffering from recurrent major depression and post-traumatic stress disorder, as a result of this accident. Dr. Rowden testified that Ms. Guidroz presented with a great deal of anxiety, thoughts of suicide, changes in appetite and sleep problems, and he explained that the effects of these problems on Ms. Guidroz have been "very significant" and "global." Both Drs. Rowden and Angelloz opined that Ms. Guidroz would need continued psychological treatment for up to four more years.
Considering the evidence of Ms. Guidroz's severe physical and psychological injuries, we cannot conclude that the trial court abused its vast discretion in awarding her $450,000.00 in general damages.

Mr. Guidroz's Loss of Consortium Award
The DOTD also contends that the award of $30,000.00 to Mr. Guidroz for loss of consortium is excessive. Both Mr. and Mrs. Guidroz testified about the change in their relationship since the accident. Ms. Guidroz related that prior to the accident, she and her husband were very close and shared everything with each other. However, she now is unable to take pleasure in family events and outings. Ms. Guidroz also explained that since the accident, her sexual relationship with her husband has been almost non-existent, because of the pain she experiences from even limited physical contact, such as being hugged and kissed, as well as from other acts of intimacy.
Mr. Guidroz testified that his wife's personality changed following the accident, in that her pain makes her very edgy and unable to communicate and talk with him. He also stated that Ms. Guidroz used to accompany him when he played music in a band; however, because she can no longer tolerate loud noise, she is unable to accompany him. Regarding their sexual relations, Mr. Guidroz explained that he must be careful when he touches her and they can no longer kiss because of her problems with pain.
Moreover, Dr. Rowden testified that Ms. Guidroz has great difficulty in taking pleasure in simple housekeeping duties, in parenting or in co-habitation with her husband, and her psychological problems have interfered with her ability to experience pleasure, trust, intimacy and nurturing.
Dr. Angelloz, who also counseled Mr. Guidroz in joint sessions with his wife, testified that Mr. Guidroz has been cast into a protective role in attempting to aid his wife in her recovery, which will not be a healthy role for him over time. She recommended counseling for Mr. Guidroz to help him focus on his own emotional problems resulting from Ms. Guidroz's accident. Considering *1370 this evidence, we likewise are unable to say that the trial court abused its discretion in making this award.

LOSS OF EARNINGS CLAIM

(DOTD's Assignment of Error No. 3)
In this assignment of error, the DOTD contends that the trial court erred in finding that Ms. Guidroz's loss of earning capacity was caused by the injuries she sustained in the June 7, 1989 accident. The plaintiff has the burden of proving, by a preponderance of the evidence, the causal connection between the accident and the damages claimed. Whether this burden has been sustained is a question for the trier of fact, and its finding will not be disturbed on appeal unless clearly wrong. White v. Government Employees Insurance Company, 527 So.2d 39, 41 (La.App. 3rd Cir.), writ denied, 528 So.2d 153 (La.1988).
As stated above, Ms. Guidroz suffers from post-traumatic stress disorder, which Drs. Angelloz and Rowden have opined has currently rendered her unemployable. Moreover, Drs. Angelloz and Rowden both attributed Ms. Guidroz's post-traumatic stress disorder to the June 7, 1989 accident. However, the DOTD notes that Ms. Guidroz returned to work within three weeks after the accident and continued to work until she was terminated almost two years later as support for its contention that there is no causal relationship between the accident at issue and Ms. Guidroz's present inability to work.
Prior to the accident in question, Ms. Guidroz was employed by Greene Veterinarian Clinic, assisting with surgery and performing bookkeeping and secretarial work. She worked thirty-two hours per week. Following the June 7, 1989 accident, Ms. Guidroz returned to work on June 23, 1989, working for very short periods of time until she eventually increased her hours to thirty hours per week again. Ms. Guidroz continued in her employment with Dr. Greene until she was terminated on August 21, 1991, due to bookkeeping discrepancies.
When questioned about Ms. Guidroz's returning to work after the accident and working for a period of almost two years, Dr. Rowden testified that while he was of the opinion that Ms. Guidroz was unemployable within months after the accident from a psychological standpoint, he would not be surprised that Ms. Guidroz had worked for up to one to two years after the accident. Dr. Rowden explained that because of her ability to repress, deny and sublimate trauma, he believed Ms. Guidroz could have worked for up to two years after the accident. However, Dr. Rowden further explained that over time, her ability to cope would begin to dwindle.
Dr. Angelloz similarly testified that Ms. Guidroz's continuing to work was in keeping with her psychological make-up at that time. Dr. Angelloz explained that in situations involving a patient who has suffered a life-threatening trauma, the patient literally tries to divorce himself or herself from the trauma and to maintain functioning at a level prior to the trauma. Dr. Angelloz opined that Ms. Guidroz had a "compelling" need to be productive and that she was
still trying to portray to the outside world that everything was okay with [her] and that included going to work and trying to do her job when ... she should have been in [her doctor's] office more directly addressing these issues, rather than trying to do what the typical trauma people do, [which] is [to] deny, avoid, and escape dealing with whatever is happening to them.
Thus, Ms. Guidroz was outwardly attempting to show that she was able to function when she was, in fact, disabled. According to Dr. Angelloz, Ms. Guidroz's personal resources for managing both her anxiety and depression deteriorated over time.
The DOTD further contends Ms. Guidroz suffered three additional major stresses in her life in 1991, which have resulted in her current psychological condition. These "major stresses" were: an accident in July, 1991, in which Ms. Guidroz sustained a concussion; the loss of her job at Greene Veterinarian Clinic; and diagnosis of cancer of the large intestine.
With regard to the effect of these additional stressors on Ms. Guidroz's present psychological state, Dr. Angelloz stated that stress is a cumulative phenomenon. She opined *1371 that these additional stresses combined with the initial major stressor, namely, the June 7, 1989 accident, to adversely affect Ms. Guidroz's mental status, capacity to cope and ability to engage in gainful employment. Dr. Angelloz also noted that Ms. Guidroz would have been better able to cope with the events occurring in 1991 had she not been involved in the June 7, 1989 accident.
When asked to distinguish between the injuries or suffering resulting from the June 7, 1989 accident and those relating to the additional events in 1991, Dr. Rowden testified that the initial trauma of June 7, 1989 contributes to a great degree to her inability to cope. He further stated that the post-traumatic stress disorder was "related specifically" to the June 7, 1989 accident.
Based upon this medical evidence, the trial court concluded that the accident in question caused Ms. Guidroz's inability to work, and we find no manifest error in this conclusion.
This assignment of error lacks merit.

LEGAL INTEREST

(Plaintiffs' Assignment of Error No. 2)
Plaintiffs argue that the trial court erred in failing to include legal interest, as prayed for, in accordance with LSA-C.C.P. art. 1921. We agree. Louisiana Code of Civil procedure article 1921 provides that "[t]he Court shall award interest in the judgment as prayed for or as provided by law." (Emphasis added.) Despite a prayer for legal interest in plaintiff's petition, the trial court failed to make such an award in its judgment. Thus, the judgment will be amended accordingly to reflect an award of interest.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is amended to award legal interest in favor of plaintiffs, and against the DOTD, in accordance with law. In all other respects, the judgment is affirmed. Costs of this appeal, in the amount of $1,323.85, are assessed against the State of Louisiana, through the Department of Transportation and Development.
AMENDED AND, AS AMENDED, AFFIRMED.
NOTES
[1] The DOTD does not challenge the finding of fault on its part. In fact, the DOTD's own expert testified that the drop-off between the roadway and the shoulder, which was too great, was a cause of the accident. Thus, we are not called upon to review the trial court's finding of fault of the part of the DOTD.
[2] For the reasons previously set forth, we will not address apportionment of any percentage of fault to the "phantom" driver.