781 So.2d 12 (2000)
Celia R. Dennis, Wife of/and Gerald F. DENNIS, Jr.
v.
THE FINISH LINE, INC., et al.
Julie A. Cassisa
v.
Celia Dennis, et al.
Nos. 99 CA 1413 and 99 CA 1414.
Court of Appeal of Louisiana, First Circuit.
December 22, 2000.
Writ Denied March 16, 2001.
*18 Randolph C. Slone, Jane L. Triola, Slidell, for Plaintiff-Appellant/Appellee Celia Dennis.
Ronnie G. Penton, Bogalusa, for Plaintiff-Appellant/Appellee Julie A. Cassisa.
Rodney A. Ramsey, Stephen F. Babin, Attorney General's Office, Baton Rouge, for Defendant-Appellee/Appellant State of Louisiana through Department of Transportation and Development.
Before: CARTER, C.J., LeBLANC, PARRO, KUHN, and GUIDRY, JJ.
PARRO, J.
In these consolidated personal injury cases arising out of a two-car collision, the State of Louisiana, through the Department of Transportation and Development, appeals the trial court's judgments against it in favor of the plaintiffs, Celia R. Dennis and Julie A. Cassisa. Ms. Dennis and Ms. Cassisa also appeal the judgments.

FACTUAL AND PROCEDURAL BACKGROUND
Celia R. Dennis, a bartender at The Finish Line,[1] worked the afternoon and evening of Friday, October 5, 1990. During her shift, one of the customers, Felix D. Givens, caused a disturbance and then "passed out" at the bar. Several employees of The Finish Line removed Mr. Givens from the bar around 5 p.m. and placed him in his car in the parking lot. When Ms. Dennis finished her shift at 11:30 p.m., Mr. Givens was still asleep in the back seat of his car. About midnight, after she had picked up some groceries from a store in the strip mall where the bar was located, Ms. Dennis went back to Mr. Givens' car. She woke him and offered to drive him home with someone else following. Mr. Givens said he was fine, climbed into the front seat, and drove out of the parking lot. Because she was still concerned about him, Ms. Dennis followed a short distance behind him as he proceeded in a northerly direction on U.S. Highway 11. At some point, she noticed that Mr. Givens' vehicle crossed the center line of the two-lane highway into the southbound lane. Almost immediately thereafter, Ms. Dennis saw headlights coming toward her, and her car was struck head-on by a car driven by Julie A. Cassisa.
Ms. Cassisa and her two passengers had been traveling in a southerly direction on U.S. Highway 11 when Mr. Givens' vehicle encroached on her lane. To avoid being hit, she swerved entirely onto the shoulder of the road and almost immediately turned back toward the highway. When Ms. Cassisa's car re-entered the highway, it bumped over the edge of the pavement, angled across the southbound lane, and struck the car being driven by Ms. Dennis. Ms. Cassisa and Ms. Dennis were seriously injured as a result of the head-on collision.
In May 1991, Ms. Dennis and her husband, Gerald F. Dennis, Jr., filed a lawsuit for damages resulting from this accident.[2] The named defendants were The Finish Line, Inc.[3]; Ms. Dennis's uninsured motorist insurer, Allstate Insurance Company; Julie A. Cassisa and her parents, Joanne L. and John J. Cassisa; the Cassisas' automobile liability insurer, Automotive Casualty *19 Insurance Company; the State of Louisiana through the Department of Transportation and Development (DOTD); Felix D. Givens; and the unknown insurers of The Finish Line and Mr. Givens. Various third-party claims, cross-claims, and interventions were filed, but all claims of all parties were eventually settled and dismissed except for Ms. Dennis's claims against DOTD and Mr. Givens.
In June 1991, Ms. Cassisa filed suit against Ms. Dennis, Mr. Givens, Jefferson Downs Corporation, d/b/a The Finish Line, Allstate Insurance Company, and various other insurance companies; an amendment later added DOTD as a defendant. The Cassisa case was later consolidated with the Dennis case. Eventually, all claims of all parties in the Cassisa case were also settled and dismissed, leaving only her claims against DOTD and Mr. Givens.[4]
After a three-day trial, the court apportioned fault as follows: Mr. Givens65%; DOTD15%; The Finish Line15%; Ms. Cassisa5%; and Ms. Dennis0%. In a judgment dated October 12, 1998, the court found in favor of Ms. Dennis and against Mr. Givens and DOTD, "solidarily up to 50%," for $624,364.41. The judgment reserved to DOTD "any and all rights of reduction, if any," due to the apportionment of fault to any other tortfeasor or settlement of any other tortfeasor. In a separate judgment rendered the same day, the court found in favor of Ms. Cassisa and against Mr. Givens and DOTD, "solidarily up to 50%," in the amount of $1,901,310.77. This judgment similarly reserved to DOTD whatever rights it might have to reduce its payments due to the apportionment of fault to the plaintiff or other settling tortfeasors.
Apparently the parties were unable to agree on whether DOTD had any right to reduce its payments to Ms. Dennis and Ms. Cassisa as a result of their settlements with The Finish Line.[5] Ms. Dennis and Ms. Cassisa argued that the court may have been legally correct in apportioning fault to The Finish Line, because Louisiana Civil Code article 2323 required the court to determine a percentage of fault for all persons causing or contributing to the injury, regardless of the party's statutory immunity.[6] Nevertheless, they argued that because The Finish Line was statutorily immune from suit by virtue of Louisiana Revised Statute 9:2800.1, DOTD did not have a right to contribution from The Finish Line. Therefore, they contended DOTD should not be able to reduce its payments to Ms. Cassisa and Ms. Dennis by the 15% of fault attributed to the settling party. Because the parties could not agree whether the court's October 12, 1998 judgments allowed DOTD to reduce its payments under these circumstances, Ms. Cassisa and Ms. Dennis filed a motion to clarify the judgment. After considering briefs and arguments on this issue, the trial court clarified its October 12, 1998 judgments, stating in a judgment dated November 17, 1998, that The Finish Line was not an immune party. This clarifying judgment, like the initial one, did not expressly state whether DOTD could therefore *20 reduce its payments to Ms. Cassisa and Ms. Dennis, nor did it indicate the dollar amount of any such reduction.
All parties except Mr. Givens appealed. DOTD appealed only the October 12, 1998 judgments, assigning as error the trial court's apportionment of fault to it, the court's failure to limit the state's liability for general damages to the statutory $500,000 general damage cap imposed in 1985, and the excessive awards to Ms. Cassisa and Ms. Dennis. Ms. Dennis and Ms. Cassisa appealed both the October 12, 1998 judgments and the November 17, 1998 clarifying judgment. They claim the trial court's October 12, 1998 judgments were not definitive, because the judgments did not specify whether DOTD was entitled to a credit for their pre-trial settlements with The Finish Line and did not specify the amount of any such credit. They contend DOTD is not entitled to reduce its judgments by the percentage of fault assessed to The Finish Line. They also assert that the court was incorrect in concluding The Finish Line was not immune from liability and in its apportionment of fault among the parties. Specifically, they urge that the court erred in assigning any fault to The Finish Line and should have assigned more fault to DOTD than to Mr. Givens.

APPORTIONMENT OF FAULT
All appellants have assigned as error the trial court's apportionment of fault among the parties. A determination of the allocation of fault by the trier of fact is a factual finding and cannot be overturned in the absence of manifest error. Barsavage v. State, Through Dep't of Transp. and Dev., 96-0688 (La.App. 1st Cir.12/20/96), 686 So.2d 957, 962, writs denied, 97-0595, 97-0634 (La.4/18/97), 692 So.2d 455 and 456. DOTD contends the trial court should not have assigned any fault to it. Ms. Dennis and Ms. Cassisa claim the court should have assigned 75% of the fault to DOTD, 20% to Mr. Givens, and none to The Finish Line.[7]

Liability of DOTD
DOTD's 15% liability was based on the condition of the shoulder of the road, which the trial court found was defective because its aggregate surface was not compacted and was not graded even with the level of the highway's paved surface. When these consolidated cases were filed, DOTD's liability to a plaintiff could arise under a theory of negligence, Louisiana Civil Code article 2315, or a theory of strict liability, Louisiana Civil Code article 2317.[8]Hunter v. Dep't of Transp. and Dev., 620 So.2d 1149, 1150-51 (La.1993). Under either theory, the plaintiff must prove: (1) the thing that caused the damage was in the custody of the defendant; (2) the thing contained a defect, that is, a condition that created an unreasonable risk of harm to the plaintiff; and (3) the defective condition of the thing caused the plaintiff's injuries. In essence, the only difference between the negligence theory of recovery and the strict liability theory of recovery is that the plaintiff need not prove the defendant was aware of the existence of the defect under the strict liability theory. Under the negligence theory, it is *21 the defendant's awareness of the dangerous condition of the property that gives rise to a duty to act. Under a strict liability theory, it is the defendant's legal relationship with the property containing a defect that gives rise to the duty. Oster v. Dep't of Transp. and Dev., 582 So.2d 1285, 1288 (La.1991). Under either a strict liability or a negligence theory of recovery, the liability of DOTD to an injured plaintiff hinges on whether it has breached a duty to the plaintiff. Gibson v. State, through Dep't of Transp. and Dev., 95-1418 (La. App. 1st Cir.4/4/96), 674 So.2d 996, 1001, writs denied, 96-1862, 96-1895, 96-1902 (La.10/25/96), 681 So.2d 373 and 374.
DOTD acknowledges that it has "custody" of U.S. Highway 11 and is responsible for keeping the highway and shoulders in a reasonably safe condition. Therefore, the first requirement of liability is met. However, DOTD contends the record contains no evidence of any defective condition of the highway or shoulder that created an unreasonable risk of harm for these plaintiffs. The ultimate determination of whether a condition creates an unreasonable risk of harm is subject to review on appeal under the manifest error standard. Reed v. Wal-Mart Stores, Inc., 97-1174 (La.3/4/98), 708 So.2d 362, 365; Borruano v. City of Plaquemine, 97-1926 (La.App. 1st Cir.9/25/98), 720 So.2d 62, 64. Under this standard, the trial court's findings are reversible only when there is no reasonable factual basis for the conclusions, or if they are clearly wrong. Aucoin v. State, through Dep't of Transp. and Dev., 97-1938, 97-1967 (La.4/24/98), 712 So.2d 62, 65. DOTD claims the only evidence of the condition of the highway and shoulder is from an expert who first viewed the accident site some six months after the accident, and from photographs taken at the scene showing only the shoulder on the opposite side of the highway, not the shoulder used by Ms. Cassisa. DOTD asserts that none of the evidence shows the highway or shoulder was defective on the night of the accident. Therefore, DOTD argues that the trial court was manifestly erroneous, because none of its factual conclusions pertaining to DOTD's liability were supported by the evidence.
However, one of Ms. Cassisa's passengers, Chris Tiblier, had a clear recollection of the moments just before the accident.[9] Mr. Tiblier testified that Ms. Cassisa was driving southbound at or near the speed limit when he saw headlights coming toward them from a northbound vehicle. Ms. Cassisa immediately swerved completely onto the right shoulder to evade the oncoming vehicle. Her car slowed somewhat while all four wheels were in the gravel on the shoulder, but began to "fishtail" as she attempted to pull back onto the highway, possibly to avoid running into the ditch on their right. Mr. Tiblier said he heard gravel hitting the underside of the car in the few seconds that the car was on the shoulder. Then, as Ms. Cassisa turned the steering wheel to the left, he felt the wheels jump up as they re-entered the highway. He said, "I recall when we entered back onto the road, it felt like we hit the curb, that we hopped over it."
The state trooper who prepared the accident report did not note any defect in the highway condition, but he did characterize the shoulders as "loose." A photograph he took of Ms. Cassisa's car where it came to rest at the edge of the southbound lane shows what appears to be a drop-off of several inches between the paved surface of the highway and the aggregate shoulder. *22 A photograph of Ms. Dennis's truck on the other side of the highway shows its right rear wheel mired in several inches of loose gravel on the shoulder. Other photographs taken by the trooper show gouge marks on the pavement where the vehicles collided.
Charles Hedges, a civil engineer with expertise in highway design and construction, first visited the accident scene in April 1991. The gouge marks shown in the accident scene photographs were still visible in the roadway, and debris from the vehicles was still present at the side of the road, so the accident site was easy to ascertain. Mr. Hedges noted that the shoulder at the accident site was made of aggregate, which is sand and gravel mixed with natural earth, and was not graded level with the highway pavement. In the area where Ms. Cassisa would have traveled on the shoulder, the drop-off between the pavement and shoulder measured four inches. Mr. Hedges stated that the correct procedure for maintaining an aggregate shoulder would include grading the area to bring the aggregate even with the pavement and then using some kind of rolling device to compact the aggregate so it would not remain loose. From his review of Mr. Tiblier's testimony, Mr. Hedges opined that the shoulder was probably soft when Ms. Cassisa encountered it. The fishtailing described by Mr. Tiblier indicated that the wheels were not getting good traction or frictional grip on the shoulder. Mr. Hedges concluded that the drop-off described by Mr. Tiblier caused the accident to occur, because Ms. Cassisa had to exert a greater force or torque on the steering wheel in order to move the left front tire over the bump and regain the pavement. As that tire hit the pavement, it "would tend to grip it quickly and cause the car to rotate. That rotation would be exaggerated because the other wheels are still on the ... soft shoulder with lower friction ...." Because Ms. Cassisa had to use this additional torque to make the tires mount the pavement, and because the "sling-shot effect" happened so quickly, she could not counteract and direct her car away from the opposite lane.
In Mr. Hedges' opinion, an aggregate shoulder that is not compacted to achieve a compressed high density is a defective shoulder. A DOTD Daily Work Report from several weeks before the accident showed grading work was done somewhere in the vicinity of the accident site at that time, but there was no evidence of rolling equipment being used during this maintenance. The DOTD maintenance manual called for repair whenever a shoulder showed a three-inch drop from the paved surface; the instructions for restoration of non-paved shoulders stated that shoulder materials were to be dumped and placed by blading and rolling. Mr. Hedges noted that between his first visit and the trial, he re-examined the site about ten times, the last time just four days before the trial. During those visits, although he saw evidence of some inconsistent maintenance over a long stretch of roadway, the condition of the highway and shoulders at the accident site remained essentially the samethe shoulders were not well compacted and were not flush with the pavement. However, Mr. Hedges admitted that because the soil conditions varied from one spot to another along the shoulder and because he did not know exactly where the Cassisa vehicle traveled on the shoulder, he could not know exactly what the soil conditions were at the spot where Ms. Cassisa left the highway and tried to re-enter. For the same reasons, he could not say with certainty that she encountered a four-inch drop-off as she turned back onto the pavement.
Dr. Olin Dart, a civil engineer with expertise in highway design and accident *23 reconstruction, also testified on behalf of the plaintiffs. Dr. Dart also concluded, on the basis of Mr. Tiblier's testimony, that there was loose material on the shoulder that helped induce the fishtailing experience, and that the sensation of hitting a curb was due to the vertical drop-off at the edge of the pavement. He stated:
That's the classic problem that you have, an edge drop, in that the front wheel is up against that and the driver's trying to regain the highway and cranks in [excessive] steering to eventually overcome that resistance, and then when it breaks free, you're aimed at an angle and go across the road.
From the photographs of the damaged vehicles and their locations after the collision, he estimated that the Cassisa vehicle hit the Dennis vehicle at a 30-degree angle at about 35 miles per hour. Dr. Dart opined the shoulder was defective because of the material consistency and the edge drop, and that these conditions were causative factors in the accident. He acknowledged that the precipitating cause of the accident was Mr. Givens' encroachment into the southbound lane, and that Ms. Cassisa's over-steering was also a factor, stating:
Yes, because she [is] headed for [the] ditch, she is trying to correct, she's putting more steering than that loose surface would hold. In other words, it caused her to slide out.
Dr. Dart also admitted on cross-examination that a driver who is forced onto the shoulder should slow down until it is possible to re-enter the highway at a lower speed, but opined that Ms. Cassisa probably did lose about 20 miles per hour on the shoulder, given his estimate that the impact speed was 35 miles per hour. Concerning the edge drop-off, Dr. Dart noted that the maintenance standards for the state suggest that at three inches, it should be scheduled for regular maintenance and at five inches, it should be considered an emergency. He emphasized that an aggregate shoulder should be compacted by rolling in order to provide a reasonably firm surface, and pointed out that DOTD's records showed that no rolling equipment had been used when maintenance was performed.
Maurice Jourdan, who was DOTD's district maintenance engineer when this accident occurred, testified concerning the procedures and standards for maintaining state-owned roads, bridges, and appurtenances. He acknowledged that the DOTD maintenance procedure for an edge drop-off condition required maintenance to be scheduled at three inches, with five inches requiring immediate repair on an emergency basis. He admitted that a three-inch drop-off from the pavement edge to the shoulder would be a deficiency, but he would not characterize it as a defect. Mr. Jourdan reviewed Daily Work Reports showing maintenance activity in the general area of the accident site within the month preceding the accident. He had not discussed the case with the DOTD employees who actually did that maintenance work, so he could not identify the precise location of their work, the condition of the shoulders, or the procedures they used to repair them. According to the Daily Work Reports, the maintenance performed was reshaping non-paved shoulders; Mr. Jourdan said this procedure involves pulling the aggregate material back toward the pavement to make it flush with the riding surface. This repair work was done with a motor patrol, commonly known as a "road grader," a machine with an adjustable blade. No rolling machine was used; the only compacting done after the grading procedure was by the wheels of the motor patrol riding over the portion of the shoulder nearest the pavement. This procedure *24 would compact an area approximately twelve inches wide alongside the pavement, but would not compact the middle of the shoulder. Mr. Jourdan said DOTD generally did not use rolling machines for shoulder restoration unless about five or six inches of material were being added to the entire width of the shoulder to repair some major degradation. In his opinion, no additional compaction was necessary when routine maintenance was done.
David Wayne Hall, a civil engineer with expertise in traffic engineering, highway design, and accident reconstruction, also testified on behalf of DOTD. He opined that the accident was precipitated by Mr. Givens when he crossed the double yellow center line, forcing Ms. Cassisa onto the shoulder. The other causative factor was her over-steering to return to the highway. He stated that if forced to use the shoulder, a prudent driver should slow down and travel parallel to the highway on the shoulder until it is safe to reenter the highway. Based on Mr. Tiblier's testimony, Mr. Hall concluded there was no reason Ms. Cassisa could not have done that instead of immediately turning back toward the highway. He also indicated that the fact that gravel hit the undercarriage of Ms. Cassisa's car did not signify that the shoulder was loose; this was an inherent characteristic of an aggregate shoulder. He also stated that a car can fishtail on asphalt if the steering wheel is turned hard in one direction and then the other. Mr. Hall said the photographs taken immediately after the accident were inconclusive with reference to any edge drop-off or looseness of the shoulder, and he saw nothing in the evidence to indicate the shoulder was defective at the time of the accident. He assumed that the shoulder was in good shape, because it had been maintained nine or ten days before the accident. But Mr. Hall, like the other experts, had not seen the highway until some time after the accidentin his case, seven years after the accident occurred. He had spoken with Mr. Jourdan about the condition of the highway, but had not talked with the actual maintenance crew who had worked somewhere in that area the month before the accident, so he did not know if the maintenance work was done where Ms. Cassisa was forced to use the shoulder.
Looking at the photographs, Mr. Hall said there appeared to be some loose gravel on the surface of the shoulder, but he assumed it was a mechanically stable shoulder because of overlay and shoulder work completed in 1956 and 1971 and the re-blading maintenance work done since that time. However, he also based that opinion on maintenance "where they have used rollers on occasion to roll the shoulders," a fact which was not supported by the evidence.
Mr. Hall relied extensively on the Daily Work Reports and information from Mr. Jourdan in reaching his conclusion that the shoulder was not defective when the accident occurred. He admitted that the sensation Mr. Tiblier described of "jumping a curb" would not occur if the pavement was flush with the shoulder, so there must have been some kind of edge drop-off where Ms. Cassisa re-entered the highway. However, Mr. Hall could not estimate the depth of the edge drop-off based on Mr. Tiblier's comment. Mr. Hall agreed that as a general proposition, a driver who is driving parallel to the highway on the shoulder will have to exert additional steering to overcome an edge drop-off upon re-entry, causing the car to enter the highway at a greater angle than it would if the pavement and shoulder were flush. At a speed of 45 miles per hour, it would have taken less than a second for Ms. Cassisa's car to traverse the 45 feet from re-entering the highway to crossing the center line *25 and hitting the Dennis vehicle. Responding to questions from the court, Mr. Hall admitted that loose gravel on the shoulder with a depth of one-half to one inch might cause a car to fishtail upon hitting it.
The experts on both sides identified and agreed that the 1956 AASHO guidelines for rural highway design[10] were applicable to U .S. Highway 11. These guidelines stated the following concerning non-paved shoulders:
Unstabilized shoulders frequently are hazardous because the elevation of the shoulder at the pavement edge tends to become one-half to several inches lower than the pavement.... All types of shoulders should be constructed and maintained flush with the paved surface if they are to fulfill the function for which they are intended.
The 1990 AASHTO guidelines reiterated the need to maintain the shoulder surface flush with the pavement surface.
Since 1968, the Louisiana state legislature has required DOTD to maintain all highways in conformity with AASHTO standards to the extent possible. LSA-R.S. 48:35(A). While failure to adhere to AASHTO standards may not in itself attach liability, whether DOTD has conformed to those standards is a relevant factor in determining the ultimate issue of whether the roadway is unreasonably dangerous. Aucoin, 712 So.2d at 66. DOTD's duty to maintain U.S. Highway 11 extends to the shoulders of the highway. This duty encompasses the foreseeable risk that a motorist might, for any number of reasons, find himself traveling on, or partially on, the shoulder. Whether DOTD breached its duty to the motoring public by knowingly maintaining a defective or unreasonably dangerous shoulder depends on the facts and circumstances of each case. Brown v. Louisiana Indem. Co., 97-1344 (La.3/4/98), 707 So.2d 1240, 1242. Courts have consistently held that an abrupt drop-off between a roadway and a shoulder constitutes a defect. This court's prior holdings dealing with drop-off levels indicate that the existence of a two or three-inch differential between the roadway and the shoulder is a defective condition. Lee v. State, 98-2559 (La.App. 1st Cir.12/28/99), 751 So.2d 321, 325.
Based on our review of the evidence, we conclude the trial court's factual finding that the condition of the shoulder was unreasonably dangerous has evidentiary support and is not clearly wrong. Mr. Tiblier's testimony, combined with the experts' later observations concerning the highway condition at various times, supports the conclusion that there was a significant drop-off between the pavement edge and the shoulder and that the shoulder was insufficiently compacted. These factors, in combination, contributed to the excessive angle at which Ms. Cassisa's car re-entered the highway, causing it to "slingshot" across the southbound lane and into the northbound lane where Ms. Dennis was traveling. Further, because a DOTD maintenance crew had been in the general area where the accident occurred only ten days earlier, but failed to notice or correct the shoulder problems at this precise location, we agree with the trial court that DOTD had actual or constructive notice of this defect. Therefore, the trial court correctly assigned liability to DOTD, under either a negligence or strict liability standard.

Liability of Ms. Cassisa
A driver of a vehicle who fails to respond prudently once the vehicle has *26 left the roadway is proportionately at fault. Lee, 751 So.2d at 324. Prudent behavior for a motorist who drives off the paved roadway onto the shoulder is first to reduce speed and then to attempt a gradual reentry after the motorist has regained control of the vehicle. Guidroz v. State, Through Dep't of Transp. and Dev., 94-0253 (La.App. 1st Cir.12/22/94), 648 So.2d 1361, 1364. When Ms. Cassisa's actions are evaluated in the light of these standards, it is clear that her reaction, when she found herself forced to the shoulder of the road, was something less than prudent. Mr. Tiblier testified that when her car hit the shoulder, she almost immediately turned the steering wheel hard to the left to regain the pavement. Yet, other than conjecturing that she may have been trying to avoid the ditch, he admitted there was nothing preventing her from just staying on the shoulder and slowing until she had her car under control. Under the circumstances, her reaction is perhaps understandable, but the court was certainly justified in assigning some fault to Ms. Cassisa.

Liability of The Finish Line
In written reasons for judgment, the court explained the liability of The Finish Line as follows:
Dennis' testimony at trial showed that The Finish Line provided no instruction to its employees as to how to deal with intoxicated customers. Furthermore, upon being notified of Givens passing out at the bar, the supervisor or manager, Timothy Hart, had Givens removed from the bar and placed in his car, with his keys. Accordingly, the Court finds the actions or omissions of The Finish Line constituted negligence [and] were a cause in fact of the accident. The Court attributes fault to The Finish Line, in the amount of fifteen percent (15%).
However, in the very next sentence, the court stated:
The Court cannot, from the evidence and testimony presented, deduce with any reasonable certainty whether Felix Givens was still intoxicated from the alcohol he had consumed earlier, whether he dozed off while driving, whether he simply failed to pay attention, or whether some other factor caused him to veer into the southbound lane.
Accepting this sentence as an accurate summary of the trial court's factual conclusions concerning Mr. Givens' condition when he crossed the center line, it is obvious that the court failed to find a causal link between that occurrence and the acts and omissions of The Finish Line.[11] If Mr. Givens' action of crossing into the southbound lane was not clearly attributable to intoxication or its aftermath, then there is no connection with the fact that some hours earlier, The Finish Line employees put him in his car with his keys after he had passed out at the bar.
After reviewing the evidence, we conclude the causal link to establish the liability of The Finish Line was not established. Ms. Dennis testified that Mr. Givens had about five beers during the afternoon and passed out about 5 p.m. She woke him seven hours later and offered to drive him home. He declined her offer, saying he *27 was fine. He got into the front seat of his car and drove onto the highway. Other than the one time he crossed the center line and precipitated the accident, Ms. Dennis did not notice any erratic driving by Mr. Givens. This evidence is insufficient to prove that the action of The Finish Line in removing Mr. Givens from the bar and leaving him in his car to sleep off an intoxicated state was causally related to his crossing the center line while driving, over seven hours later. Therefore, the trial court's assignment of fault to The Finish Line was manifestly erroneous.

Liability of Ms. Dennis
The court did not assign any liability to Ms. Dennis and no one contested this portion of the judgment. Accordingly, the judgment with respect to Ms. Dennis's fault is final.

Re-allocation of Fault
Having found that the trial court was clearly wrong in apportioning fault to The Finish Line, this court must make an adjustment. However, before doing so, we must re-examine the allocations of fault to the remaining parties to determine whether the court's allocation of fault between those parties was manifestly erroneous.
In apportioning fault, the court considers the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed. Gibson, 674 So.2d at 1005. The factors to be considered include: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacity of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste without proper thought. Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967, 974 (La.1985); Moore v. Safeway, Inc., 95-1552 (La.App. 1st Cir.11/22/96), 700 So.2d 831, 853, writs denied, 97-2921, 97-3000 (La.2/6/98), 709 So.2d 735 and 744. If an appellate court finds a clearly wrong apportionment of fault, it should adjust the award, but only to the extent of lowering or raising it to the highest or lowest point respectively that is reasonably within the trial court's discretion. Clement v. Frey, 95-1119, 95-1163 (La.1/16/96), 666 So.2d 607, 611; Barsavage, 686 So.2d at 962; Lee, 751 So.2d at 325.[12]
With those standards in mind, we conclude the trial court erred in allocating only 5% fault to Ms. Cassisa. Our initial impression of the allocation of fault in this case was that Ms. Cassisa should have borne a greater responsibility for the accident; *28 after a thorough review of the evidence, we are convinced the trial court should have allocated a greater percentage of fault to her. She certainly was faced with an emergency situation, but if she had simply stayed on the shoulder and slowed her vehicle, this accident would not have occurred. There is nothing in the evidence concerning the condition of the shoulder to indicate Ms. Cassisa could not have safely slowed her vehicle before attempting to regain the paved surface. Mr. Tiblier's testimony concerning her possible need to avoid the ditch to the right of the shoulder was purely conjectural, since Ms. Cassisa herself was unable to recall anything about the accident or her state of mind when she reacted to the oncoming headlights. Based on the evaluations of all the experts and the testimony of her passenger, it was Ms. Cassisa's over-reaction and over-steering, in combination with the defective condition of the shoulder, that caused her car to re-enter the highway at an angle that took her across the center line. Therefore, she and DOTD were equally responsible for the resulting collision. Her fault being equal to DOTD's, it should have been assessed at 15%. Accordingly, we find this is the lowest reasonable percentage of fault that is attributable to Ms. Cassisa under the facts of this case, and her total damages must be reduced by that percentage.
Of the three parties at fault, there is no doubt Mr. Givens was the most culpable. Whatever the reason for his action, he clearly swerved across the center line of the highway when a vehicle was approaching from the opposite direction. He thereby put himself and all other vehicles in the vicinity into immediate and life-threatening danger, either from a head-on collision with the oncoming vehicle or, as in this case, from the evasive maneuvers the oncoming vehicle was forced to take. Therefore, given that the other two parties combined have 30% of the fault, the court should have assessed 70% of the fault to Mr. Givens.

CAP ON DAMAGES
DOTD contends the trial court erred in failing to limit the state's liability for general damages to the $500,000 general damage cap imposed in 1985. However, this court has previously examined this issue and determined it adversely to DOTD's argument in at least two cases analogous to the consolidated cases at bar. See Farley v. State, Through Dep't of Transp. and Dev., 96-0538 (La.App. 1st Cir.9/27/96), 680 So.2d 750, writ denied, 96-2604 (La.12/13/96), 692 So.2d 1065, and Lewis v. State, 96-1586 (La.App. 1st Cir.12/20/96), 685 So.2d 640, writ denied, 97-0221 (La.3/27/97), 692 So.2d 392.
In 1985, the legislature enacted Louisiana Revised Statute 13:5106(B), which placed a cap of $500,000 on general damages awarded in suits against the state, a state agency, or a political subdivision. In the Farley case, the accident occurred in 1992 and a judgment was rendered in favor of the plaintiffs and against DOTD in 1995. The Lewis suit was filed in 1988 and a judgment was rendered against DOTD in 1994. While those suits were pending, the Louisiana Supreme Court decided, in Chamberlain v. State, Through Dep't of Transp. and Dev., 624 So.2d 874 (La.1993), that the cap on general damages in favor of the state was unconstitutional. In the 1995 legislative session, the legislature passed Act No. 1328, which was a joint resolution to submit to the electorate an amendment to Article XII, § 10(C) of the Louisiana Constitution. The proposed amendment authorized the legislature to limit the extent of liability that could be imposed on the state, state agencies, and political subdivisions. It also stated that the legislature could provide that any such *29 limitation shall be applicable to existing as well as future claims. The amendment passed and became effective on November 23, 1995. During the 1995 legislative session, the legislature also passed Act No. 828, which amended Louisiana Revised Statute 13:5106 to provide for a $750,000 cap on general damages when and if the constitutional amendment passed. Pursuant to Act No. 828, Paragraph (B) of the statute was amended to state:
In any suit for personal injury, the total amount recoverable, exclusive of medical care and related benefits and loss of earnings, and loss of future earnings, as provided in this Section, shall not exceed the limit of liability in effect at the time of judicial demand. On the effective date of this Subsection, the limit of liability shall be seven hundred fifty thousand dollars .... (Emphasis added).
In both Farley and Lewis, this court noted that, at the time of judicial demand, there was no limitation on the state's liability, because the cap was declared unconstitutional in Chamberlain while those cases were pending. According to Magee v. Landrieu, 95-0437 (La.App. 1st Cir.3/17/95), 653 So.2d 62, 67, writ denied, 95-0790 (La.4/21/95), 654 So.2d 319, the Chamberlain decision was to be applied retroactively to all cases pending when it was rendered, making the cap on damages unenforceable in those cases. These consolidated cases that we are reviewing, filed in 1991, were also pending when Chamberlain was decided. Therefore, under the Magee rationale, there was no effective cap on general damages in favor of the state on the date of judicial demand in these cases.
The next inquiry is whether the later-passed constitutional amendment and amended statute, both of which passed while the cases we are reviewing were still pending, resurrected the cap. Citing Plebst v. Barnwell Drilling Co., 243 La. 874, 148 So.2d 584 (1963), and Long v. Ins. Co. of North America, 595 So.2d 636 (La. 1992), this court reiterated in Lewis the long-standing principle that an unconstitutional statute is not validated by a subsequent constitutional amendment that does not expressly ratify and confirm that statute, but merely authorizes the enactment of such a statute. This court further noted that there was nothing in the later constitutional amendment or the enabling legislation expressly ratifying the $500,000 general damages cap contained in the earlier version of Revised Statute 13:5106(B). Rather, the amendment gave the legislature the discretion to apply the cap "to existing as well as to future claims." LSA-Const. Art. XII, § 10(C). Therefore the former cap was not reinstated or resurrected by the subsequent constitutional amendment. Lewis, 685 So.2d at 643.
We conclude on the basis of this jurisprudence that there was no limitation on the state's liability for general damages on the date of judicial demand in these consolidated cases, because there was an impediment to enforcing the cap contained in former Revised Statute 13:5106(B). Additionally, because the constitutional amendment did not expressly ratify that cap, it was never resurrected and is not applicable to these cases.

EXCESSIVE DAMAGE AWARDS
DOTD contends the trial court's awards of general damages to Ms. Cassisa in the amount of $1,305,000 and to Ms. Dennis in the amount of $300,000 are excessive. It also claims the awards to Ms. Cassisa of $416,749 and to Ms. Dennis of $132,402 for economic loss in the form of lost future wage earning capacity are excessive.

*30 General DamagesApplicable Law

Much discretion is left to the judge or jury in the assessment of general damages. LSA-C.C. art. 2324.1. In reviewing an award of general damages, the court of appeal must determine whether the trier of fact has abused its much discretion in making the award. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn, 623 So.2d at 1261. Only after it is determined that there has been an abuse of discretion is a resort to prior awards appropriate, and then only to determine the highest or lowest point of an award within that discretion. Coco v. Winston Indus., Inc., 341 So.2d 332, 335 (La.1976); Broussard v. Razden, 98-2576, 98-2577 (La.App. 1st Cir.12/28/99), 763 So.2d 644, 654. In reviewing a general damage award, a court does not review a particular item in isolation; rather, the entire damage award is reviewed for an abuse of discretion. Smith v. Goetzman, 97-0968 (La.App. 1st Cir.9/25/98), 720 So.2d 39, 48.

Ms. Cassisa's General Damages
DOTD contends the trial court's award of general damages to Ms. Cassisa in the amount of $1,305,000 is excessive. Therefore, we must examine the award to determine if there was an abuse of the court's discretion. The trial court divided the general damage award into eight separate items and awarded a sum for each item. However, our analysis must consider the reasonableness or excessiveness of the award as a whole, not on an item-by-item basis.
Ms. Cassisa suffered a closed head injury as a result of the accident and was unconscious when transported to Slidell Memorial Hospital. She was put on a ventilator and feeding tube and stayed in a semi-comatose condition for about ten days, during which time Dr. Gustavo Gutnisky, a neurosurgeon, treated her with medication to reduce possible swelling of her brain tissue. She experienced weakness in her left arm and on the left side of her face and had decreased cognitive abilities that gradually improved. During her hospitalization, she was also treated by a pulmonologist for acute respiratory failure.
The night of the accident, Dr. Charles Krieger, an orthopedic surgeon, repaired a laceration of her right ear and a deep, seven-inch-long laceration extending into the muscle tissue on the back of her left leg. In addition to these injuries, Ms. Cassisa had abrasions and swelling on her forehead, a broken right clavicle and scapula, a chest wall contusion, an open wound on her knee with tendon involvement, and a broken left ankle. The ankle was surgically repaired by Dr. Krieger several weeks after the accident by performing an open reduction with implantation of permanent screws. The right shoulder injury was treated with bandaging and a splint; these fractures were healed by the end of November. Ms. Cassisa was discharged on November 8, 1990, with a discharge diagnosis of "closed head injury with left sided hemiparesis, broken left ankle, and neurogenic bladder." The bladder problem was due to being catheterized while in the hospital, and soon cleared up.
By March 1991, Ms. Cassisa could walk without a limp. However, Dr. Krieger noted that, although the ankle fracture had healed by that time, she had left ankle weakness and a condition known as "drop *31 foot," both of which were attributable to her head injury. Dr. Krieger stated that the weakness in the muscles of the left foot was permanent and could not be remedied by surgical procedures or exercises.
In addition to this permanent condition, Ms. Cassisa has a long scar above her left ankle and the screws that were implanted will remain there permanently. She also has a scar and sunken area on the back of her upper left thigh, where muscle tissue was lost. Her left side is somewhat weaker overall, resulting in mild "drooping" of the muscles on the left side of her face. The physicians who treated and evaluated her attributed these conditions to the injury to the right side of her brain. At the time of trial, she also complained of frequent severe headaches and low back pain.
Besides these physical conditions, Ms. Cassisa experienced changes in her mental functioning and personality. When the accident occurred, she had just graduated several months earlier from Pope John Paul II, an academically challenging private high school in Slidell. She achieved a 4.0 grade point average (GPA) while taking honors courses, was in the National Honor Society, and graduated fifth in her class. She scored a 26 on the ACT and was admitted to Louisiana State University (LSU) as a full-time student. Her goal was to be a certified public accountant. Her friends and relatives testified that she had always been very conscientious, goalcentered, outgoing, and easy to get along with before the accident. All noticed distinct changes in her personality after the accident. In particular, she had some memory problems, had difficulty concentrating, and was often short-tempered, "harsh," and irritable. Her mother described the ease with which her daughter learned in high school, and contrasted this to the frustrating academic difficulties she experienced after the accident.
As a result of the accident, Ms. Cassisa could not complete her first semester at LSU and had to withdraw. She re-entered LSU for the spring semester, but after making one B, three D's, and an F, she was placed on scholastic probation. In summer courses at Delgado Community College (Delgado), she achieved an A and a B, but performed dismally again during the Fall 1991 semester at LSU, earning only a 1.25 GPA. She was dropped from LSU for poor scholastic achievement. After taking another summer course at Delgado, she entered the University of New Orleans (UNO) in Fall 1992. Her GPA over the next four semesters of work was a respectable 2.677, but she withdrew from all of her Fall 1994 courses and failed all of her Spring 1995 courses.[13] At the time of trial, she was still taking undergraduate courses at UNO, having changed majors four times.
Ms. Cassisa indicated she had no memory at all concerning the accident, and even had difficulty remembering her high school experiences. She had no recollection of the months at LSU before the accident. After returning to school, she changed majors several times, trying to find a field that would be easier for her and would interest her. Ms. Cassisa said she studies hard, but when faced with test questions, has difficulty recalling specific facts from all that she has studied. At the time of trial, she was still a year or two away from her undergraduate degree. Her new goals were to become a certified managerial accountant and to open her own bridal shop. She said she has constant backaches and daily headaches. Because she does *32 not remember what her personality was like before the accident, she said it was difficult for her to say whether she has changed. However, she admitted she is short-tempered now. Her mother and fiancé, who also testified, confirmed this aspect of her personality. Ms. Cassisa said her social activities at LSU might have affected her performance there, but said that because she did not have a sense of who she was or what she wanted to do, her classes did not seem very important to her at the time. At the time of the trial, she had declared her major as accounting, was taking a full course load at UNO, and was working thirty hours each week in a retail clothing specialty store. In the previous semesters, when she took a reduced course load, she had worked full-time.
Ms. Cassisa was evaluated by Dr. Deborah Burris, a neurologist with the Louisiana Rehabilitation Service, who concluded she had suffered a severe closed head injury with a residual mild left hemiparesis and cognitive dysfunction, which were permanent disabilities. Dr. Gutnisky, her treating neurosurgeon, testified in a deposition that he agreed Ms. Cassisa did have a serious head injury, and that after such an injury, he would expect that she could have some mental impairment, memory loss, or high-function deficits. Because of her problems at school and personality changes, Dr. Gutnisky referred her to Dr. John Fanning, a neuropsychologist, to evaluate her cognitive status.
Dr. Fanning reviewed Ms. Cassisa's medical and school records, spoke with her mother, and conducted a day-long battery of tests and interviews in August 1991. Relying on a statistical demographic model called the Barona Regression Model, Dr. Fanning estimated her pre-accident intellectual level as a full-scale IQ of 107, verbal IQ of 109, and performance IQ of 106. Based on his testing of her after the accident, her full-scale IQ was 101, verbal IQ was 99, and performance IQ was 102. He stated these differences were statistically insignificant and did not reflect any sizeable decrement in her overall level of intellectual functioning. However, he also explained that for a young person, the Barona model often underestimates the preaccident intellectual status, tending to skew the results toward average. Because of her high achievement in high school and on the ACT test, Dr. Fanning concluded Ms. Cassisa probably had a higher intellectual function than that suggested by the Barona model. He said the average high school student has an IQ of 105, and she had obviously performed at a much better than average level.
With respect to aspects of her mental functioning other than IQ, Dr. Fanning admitted he had no way of measuring her pre-accident condition. Dr. Fanning also stated that, from some of her comments, he believed her poor performance at LSU may have been attributable, at least in part, to her being caught up in the "party school" atmosphere. In his deposition, Dr. Fanning concluded:
[T]here probably has been some compromise of intellectual and possibly of some other cognitive functions, primarily intellectual functions, that would lower, I think, the upper most level of achievement she may be able to attain.
When he re-tested her in 1997, her memory function had improved and "did not appear suggestive of memory and learning deficits," but otherwise there were no dramatic differences in the test results. On both series of tests, Ms. Cassisa's ability to function logically, comprehend verbal and written instructions, and perform sequencing and other mental tasks was generally above average. In both 1991 and 1997, Dr. Fanning believed she could obtain her college degree. He *33 was less sanguine about her ability to become a CPA, which had been her initial goal, because of the extremely competitive nature of the examinations. Dr. Fanning noted that Ms. Cassisa's more recent accomplishments, including successful academic performance at UNO while working at a retail store, indicated her abilities had improved since the accident.
Dr. Kevin Joseph Bianchini, a neuropsychologist, reviewed Ms. Cassisa's medical and academic records, as well as Dr. Fanning's test results, and administered thirty-eight tests to Ms. Cassisa several weeks before the trial. Despite the fact that her medical records showed she had suffered a moderate to severe closed head injury, based on his tests, he found Ms. Cassisa had only mild neurocognitive problems, which he characterized as the lowest level of severity. These included some subtle problems in new learning, some problems with left upper extremity motor speed, coordination, and visual scanning. Her higher level abstract reasoning had improved significantly since she was first tested by Dr. Fanning in 1991. He generally found she had average verbal intellectual abilities and performed at the very top range of average into the high average range, which he found was probably consistent with her pre-accident abilities. He saw nothing in her test results that would prevent her from finishing college or becoming a CPA. Dr. Bianchini suggested Ms. Cassisa's academic problems could have been alleviated considerably by some neurological rehabilitation, from which she could still benefit. In particular, he felt her visual scanning problems could be remediated, which would make it easier for her to function in an academic or professional setting. Dr. Bianchini said that during his time with her and the ten to eleven hours spent with his technician, neither noticed any neurologically-based mood or emotion problems. The MMPI, which is a test used to assess those personality characteristics, was within normal limits.
Dr. Bianchini admitted that Ms. Cassisi had described frequent severe headaches and back pain, which might be generally compatible with a diagnosis of central and peripheral nervous system injury. However, while her difficulties with left side coordination and visual scanning were consistent with injury to the right frontal area of the brain, several tests designed for right frontal functioning showed no problems in that area. She had only a mild level of impairment in her memory functions. Although Dr. Bianchini felt her mild deficiencies were permanent, he believed neurocognitive rehabilitation could substantially improve her functional abilities. He said, "I think she has some more challenges than she had before, and I think that she probably hasn't had as much assistance with those challenges as she could use."
Dr. Cornelius E. Gorman, whose specialty was vocational rehabilitation, counseling, and evaluation, testified at the trial concerning Ms. Cassisa's abilities. Dr. Gorman did not administer any additional tests to Ms. Cassisa, relying instead on the numerous tests that had been done by Drs. Fanning and Bianchini. Looking at her pre-accident school records, he noted she had been in the top 5% on a national scale. Based on her ACT scores, he estimated her pre-accident IQ at 121 to 125. He said it was a statistical improbability that she could have achieved a score of 26 on the ACT with an IQ of 103. Dr. Gorman said Ms. Cassisa was probably not capable of attaining her initial career goal of being a CPA, but he thought she could get her undergraduate degree in liberal arts or general studies. He could not say whether or not she might be successful as the proprietor of a small retail shop, but said, "It is probable that she can develop or *34 could develop into a permanent job that would be meaningful for her."
Dr. Gorman said Ms. Cassisa could benefit from short weekly vocational counseling sessions during the academic year to assist her with study plans, study methods, and her relationship with her professors. He also recommended she switch to a smaller school, perhaps Loyola, where she could be in smaller classes with more direct attention from her professors. When questioned about her poor performance at LSU as compared to her high school performance, Dr. Gorman acknowledged that some of the difference may have been attributable to leaving the more structured home environment and moving into a less restrictive atmosphere, where she could choose to party, have a good time, and not concentrate on her school work. However, those choices could also have been a result of the head injury.
Dr. Morteza Shamsnia, a neurologist, examined and evaluated Ms. Cassisa in October 1997 to prepare for trial. He noted that she complained of daily severe headaches lasting two to four hours, neck and shoulder pain, low back pain, memory dysfunction, and sleepiness. He observed some asymmetry in her face, namely that her left side was slightly lower than the right side. Dr. Shamsnia performed a cranial nerve examination, from which he concluded there was permanent damage to the facial nerve related to injury to the right side of the brain. An MRI brain scan was normal. The motor examination revealed weakness in her left upper arm muscle, the muscle that rotates the left hand, and the muscle that helps bring the left foot up. Some of these were related to injuries to the right hemisphere of the brain; others were related to peripheral nerve injuries from the spinal cord. He said that as a result of this combination of injuries, her gait was abnormal. Her sensory examination was normal, but the reflex examination revealed a positive Babinski response on the left, an abnormality that confirmed the motor findings.
Dr. Shamsnia's final conclusion was that Ms. Cassisa had a severe trauma to the brain with a post concussion syndrome and has permanent injuries to the central nervous system and peripheral nervous system. He also concluded that her headaches and back pain were related to the accident. Nerve tests and EMG's revealed an entrapment of the nerve at the elbow, some damage to the upper part of the brachial plexus called thoracic outlet syndrome, and denervation in the back of her paraspinal muscles. He said her nerve injuries could not be remediated and would continue to produce pain and disability. Dr. Shamsnia stated, "Once you have neural damage, there is no recovery from it." He conjectured that Ms. Cassisa might develop seizures as a long-term side effect, that her sleep problem could become more progressive, and that she could possibly develop Parkinson's disease due to the closed head injuries.
Dr. Harold Ginzburg, a neuropsychiatrist, interviewed Ms. Cassisa, her fiancé, and her parents. He also reviewed all the medical records and reports from the various treating and examining physicians. Dr. Ginzburg said he was especially concerned with the emergency room records, the acute medical care that was provided to her, and the specific medical and surgical intervention. According to those records, Ms. Cassisa had compromised respiration requiring assisted ventilation for almost two weeks. He explained that respiratory compromise can cause hypoxia, which is decreased oxygen to the brain, or anoxia, which is absence of oxygen. These can cause swelling of the brain, which causes a crushing phenomenon of the brain cells. This secondary *35 swelling can combine with the initial trauma to the brain to cause damage. Dr. Ginzburg said her cerebral edema, or swelling, had been properly managed with medication. He characterized her injury as severe, and discussed the results of a SPECT scan that showed an area of her brain was not receiving profusion blood, a condition similar to a small stroke. He diagnosed her psychiatric condition as amnesic disorder due to general medical condition, mood disorder, and personality change. The latter diagnoses were based on the reported changes in her personality.
Dr. Ginzburg reported that Ms. Cassisa had damage to several areas controlling motor activities, as well as damage to the area of the brain dealing with "executive function," which is inputting, processing, and analyzing data, making a plan to use the data, and implementing the plan. He said her reported difficulties in taking tests were consistent with injury to the frontal lobe area and impaired executive function. Dr. Ginzburg stated her socially questionable and inappropriate behavior at LSU could have been related to the head injury, as was her difficulty in focusing and inability to "multi-task." He suggested she could benefit from medications to help her process information more effectively and to treat the depression that is associated with concentration problems. Once the medication was stabilized, she could be taught the "tricks of learning," to maximize her ability to assimilate and process information. He also thought Ms. Cassisa should have a brace to prevent "drop foot" and should work with a speech therapist, because the weakness in her facial muscles included the tongue and interfered with her speech when she was under stress. Dr. Ginzburg thought that with some rehabilitative assistance, Ms. Cassisa could complete her undergraduate degree.
Ms. Cassisa was also examined in November 1997 by a neurologist, Dr. Michael A. Puente. He reviewed her medical records and took a narrative history from her. Dr. Puente tested her mental status, as well as memory and speech, and did a general physical neurological examination, including cranial nerves, motor sensory function, reflexes, coordination, and gait. Her memory function was within normal limits and he detected no major problems with her speech and mental functions. She had some mild left facial weakness, evidenced by difficulty bringing up the left corner of her mouth in a smile. Otherwise, her cranial nerves were intact. Tests showed some slight weakness in the left leg; his tests did not reveal any weakness in the left arm. She had negative Babinski signs on both sides; her coordination and gait, other than difficulty with heel walking on the left, was normal. He concluded that she had some mild residual deficits, mild left-sided weakness, and probably some mild cognitive deficits and memory problems related to injuries from the accident. Although permanent, Dr. Puente did not believe these deficits would cause any significant impairment for her to function in the real world and do whatever she wants to do. His tests did not reveal any of the peripheral nervous system problems discussed by Dr. Shamsnia. In fact, after reviewing the actual nerve conduction tests performed by Dr. Shamsnia, Dr. Puente concluded these showed normal nerve conduction. Dr. Puente indicated the SPECT scan is not always reliable, tending to be overly sensitive and produce false positive findings, but acknowledged that the left-sided weakness exhibited by Ms. Cassisa was consistent with right hemispheric involvement, which is what the SPECT scan had revealed.
Louise Celeste Coleman, a vocational rehabilitation counselor, also assessed Ms. Cassisa's abilities. She took a history, reviewed *36 her medical records, and administered a career assessment inventory. When interviewed, Ms. Cassisa had declared her major as accounting, was taking a full fifteen-hour load, and was working at least thirty hours per week at the "House of Tux," a retail clothing store. Her academic goal was to get a certified management designation in accounting, which is specifically oriented toward managing a business. Ms. Coleman saw no problem with Ms. Cassisa achieving that goal. Ms. Coleman said Ms. Cassisa and her family had developed some solid plans for her goal of opening a bridal shop after graduating from UNO. Ms. Coleman suggested to Ms. Cassisa that she could improve her grades and lighten her stress by taking fewer courses or working fewer hours, but Ms. Cassisa was not interested in reducing either her workload or her school load. Ms. Coleman said her work history indicated Ms. Cassisa had strong skills in dealing with people, handling money, general business skills, and computer skills. Her career assessment inventory indicated her interests were well correlated with her skills, and should enhance her ability to accomplish her goals. Ms. Coleman found Ms. Cassisa to be a highly motivated, practical, and goal-centered individual. Ms. Coleman said she saw no necessity for Ms. Cassisa to have "life-care" assistance or tutoring in study skills and organization, as Dr. Gorman had suggested, but that such assistance could perhaps benefit her. She concluded:
Well, I think she has shown remarkable discipline in accomplishing what she has accomplished. She's working full-time. She's going to school full-time. She has had a lot to overcome, and I think she has done a remarkable job in overcoming it.
On rebuttal, Dr. Gorman discounted all of Ms. Coleman's opinions concerning Ms. Cassisa's abilities and opportunities.
The trial court awarded Ms. Cassisa the following general damages:

Traumatic brain injury, permanent nervous
system damage $900,000
Orthopedic/ankle injury 75,000
Orthopedic/clavicle injury 15,000
Orthopedic/scapula injury 25,000
Multiple internal injuries 10,000
Lacerations of leg and buttock with disfigurement 30,000
Loss of intellectual gratification, enjoyment
of life/lifestyle 150,000
Permanent, partial physical and mental disability 100,000

After reviewing the evidence, we conclude this award, which totals $1,305,000, is within the trial court's discretion for the type of injuries suffered by Ms. Cassisa. Although she has made great progress in overcoming the residual mental and cognitive dysfunctions resulting from the severe head injury, she will never be the same person she was before the accident. Her mental abilities have been permanently altered. A portion of her life is erased from her memory. As a result of accident-related personality changes, Ms. Cassisa's relationships with family and friends are more volatile. In addition, she has permanent physical scars and muscle weakness in her face and ankle causing noticeable difficulties. At the time of trial, she still suffered from chronic headaches and back pain. Ms. Cassisa is a young woman; she will be hampered by the results of this accident for the rest of her life. Under these circumstances, the trial court's award was not an abuse of discretion.

Ms. Dennis's General Damages
DOTD claims the trial court committed manifest error and abused its discretion in awarding Ms. Dennis $300,000 in general damages. As a result of the accident, Ms. Dennis's right knee was severely lacerated with tendon involvement and the kneecap was broken into several pieces. She also suffered closed metacarpal fractures of the third and fourth fingers of her left hand. She was admitted to the emergency *37 room of Slidell Memorial Hospital by Dr. James Butler, an orthopedic surgeon, who performed emergency surgery on her knee, removing the upper part of her kneecap and several bone fragments, and re-attaching the tendon to the remaining kneecap. A laceration above her eyebrow was sutured in the emergency room, and Dr. Butler placed her left hand in a splint to immobilize the fractures.
Several days later, Dr. Butler repaired the metacarpal fractures with a metal plate and screws, and performed debridement and additional repair on her knee. After this second surgical procedure, she experienced some collapsed lung tissue and adult respiratory distress syndrome; as a result, she was intubated, placed on a ventilator, catheterized, and moved to an intensive care unit. An ultrasound showed a ruptured spleen, for which a splenectomy was performed by Dr. Earl Gravois. During the surgery, Dr. Gravois noticed a large hematoma, or blood-clot, at the base of her mesocolon, so he performed an exploratory procedure to check all blood vessels and major organs in the area for internal bleeding.
Dr. Gravois explained that the main danger after a splenectomy is the patient's susceptibility to a condition called "overwhelming post splenectomy sepsis." If this occurs, the person begins to "feel rotten, like the flu," then goes into septic shock and, unless something is done, usually dies within 24 to 48 hours. The infection overwhelms the body's immune system. The syndrome can be prevented by regular doses of a vaccine called pneumovax, which immunizes the patient against 90% of the bacteria that could bring on such an infection. Also, a splenectomy patient must see a doctor immediately upon feeling sick, so a course of antibiotics can be prescribed. Although extremely dangerous, Dr. Gravois said this syndrome is pretty rare in otherwise healthy adults.
Another physician, Dr. James Newcombe, was consulted during Ms. Dennis's hospitalization for her complaints of chest pain and because she had an elevated blood glucose level. Dr. Newcombe opined that she might have bruised her heart in the accident. There was no specific treatment for the heart contusion, but the glucose level was brought down by changing her intravenous solution.
Ms. Dennis was discharged from the hospital on October 21, 1990, with pain medications and a continuous passive machine (CPM) to gently move the knee on a limited basis. At that time, she was ambulatory with a platform walker. She underwent five months of physical therapy for the knee, but regained only 80-85 degrees flexion, compared to a normal flexion range of 120-140 degrees. Consequently, on April 9, 1991, Dr. Butler performed an additional surgical procedure to repair and elongate the knee ligaments, remove adhesions and scar tissue, and improve flexion. She was hospitalized three days for this surgery, after which she again used the CPM and had additional physical therapy. Both courses of physical therapy also included treatment for low back pain and pain in her right hip. Her knee flexion improved significantly, but because of continued pain in the knee and hip, she received cortisone injections. Dr. Butler stated at trial that the change in her walking as a result of the knee injury could have affected her low back and right hip. An x-ray of the lumbar spine showed bulging at the L3-4 and L4-5 discs, but no evidence of herniation. Because of the back and hip problems, Dr. Butler referred her for additional physical therapy in December 1991. Ms. Dennis was on narcotic pain medicine from the date of the accident until March 10, 1992. At that *38 point, Dr. Butler feared that, although she still needed pain medication of some kind, she could develop a dependency on narcotic pain medication, so he recommended a lesser pain medication.
In March 1992, at the request of the Louisiana Rehabilitation Services, Dr. Butler completed an estimated functional capacity form concerning Ms. Dennis. He estimated she would never be able to lift or carry objects weighing more than 25 pounds, and should never perform tasks involving crawling or climbing. He did not know what her former job had been, so expressed no opinion concerning whether she could return to that type of work. However, he concluded she could handle a full-time job within those restrictions, including one that would involve standing or walking eight hours with some rest breaks. He assigned no limitations concerning the use of her hand.
In 1994, Ms. Dennis underwent gallbladder surgery for a condition unrelated to the accident. However, because of adhesions from the splenectomy, Dr. Gravois could not perform an outpatient procedure that would have required only four punctures, rather than an incision, to remove the gallbladder. Instead, he had to hospitalize her, use general anesthesia, and open the abdomen with an incision in order to remove the gallbladder. This procedure left another scar on her abdomen. She was discharged from the hospital after three days.
Dr. Butler saw Ms. Dennis again in March 1997 to review her condition before trial. At that time, she still complained of a constant, severe throbbing pain in her low back and right hip. X-rays revealed mild scoliosis in her upper and lower lumbar spine, mild osteoarthritic changes in the lower lumbar spine, and spur formation and early arthritic changes of the right hip joint. He testified at trial that she had probably gotten as good as she was going to get in recovering from her injuries; the knee and hip problems were permanent and the pain was chronic. As a result of the knee injury, he assigned an anatomical disability of 20% permanent impairment to the right lower extremity and an additional 5% impairment because of the hip problems. Dr. Butler indicated these problems might continue getting worse as Ms. Dennis got older and developed additional degenerative changes. However, he could not say that the arthritic changes, bulging discs, and scoliosis were related to the accident. Dr. Butler stated her hand problems had resolved with physical therapy within three to four months after the accident, but the plates and screws were still in her hand.
Ms. Dennis's mother testified that since the accident, her daughter had been unable to work full-time, because she did not have the strength, and because her leg and hip would "give out" on her. So she would work part-time and recuperate on the days she was not working. Her mother also stated that Ms. Dennis had started to limp and had started doing a constant rocking motion when sitting down. Her grip strength was not good in her injured hand, and she dropped things. Also, the plate in her hand got cold and caused discomfort. Her mother said Ms. Dennis did not sleep well and her overall physical condition seemed to be deteriorating.
Ms. Dennis testified that in early 1992, Dr. Butler told her he did not think he could do much more for her, so she resumed seeing her family physician, Dr. Jack Diamond. Dr. Diamond continued giving her injections in her hip, and continued her on some narcotic pain medicines. Ms. Dennis testified that she had quit taking prescription pain medications three years before trial, because she felt she needed to fight the pain on her own. *39 But she said she still had constant pain and had difficulty sleeping. At the time of trial, she used Tylenol P.M. for pain management, taking between twelve and fifteen each day. In early 1992, she had enrolled in a vo-tech school and tried to learn computer skills and accounting, but said she could not retain information due to the pain medications she was taking and could not sit long enough to complete the classes. She returned to work as a bartender in the summer of 1992, working about thirty hours per week. After six months, she got a better job as a waitress at Casino Magic in Bay St. Louis. The job was very difficult for her physically, however, and she had to leave after two years. She then had several jobs in succession, waitressing part-time in the French Quarter in New Orleans. Again, she could not do some tasks, such as sweeping the floor or carrying heavy trays, and the work eventually became too demanding as her physical condition got worse. After a brief stint as a motel desk clerk, she obtained the job she had at the time of trial as a part-time bartender working late night weekend shifts, which were less busy. In this job, she paid someone else to do any heavy lifting, such as picking up cases of beer. She only made $200 per week, working three eight-hour shifts, and had tried to take on a second job to make more money. However, she could not handle the additional work.
Ms. Dennis said she had always done waitressing and bartending workit was her chosen careerand was very frustrated about her inability to support herself in this line of work. Ms. Dennis said that when she sits for long periods of time, her leg swells. She also has a lot of pain in her knee, lower back, and hip. She said her hand had also gotten worse, in that she sometimes could not hold onto things and the plate in the hand stayed cold. Ms. Dennis also mentioned that when she gets an infection, it does not heal well, and attributed this to the fact that her immune system was compromised by the removal of her spleen.
A certified vocational rehabilitation counselor, Richard W. Smith, evaluated Ms. Dennis for trial purposes in December 1997. He found her very intelligent, optimistic, and outgoing. Based on his evaluation, he believed she could continue her current employment as a bartender, but was also qualified for other entry-level positions in which her wages would be equal to or greater than her pre-accident earnings.
Dr. Cornelius Gorman also evaluated Ms. Dennis in December 1997. Dr. Gorman found Ms. Dennis pessimistic, painridden, and depressed.[14] He felt her only potential for future employment would be to obtain a sedentary job, such as a part-time clerical position, which would probably pay only minimum wage. He stated that, at her age of 47, he "wouldn't waste the time" on any additional schooling, other than some short term job training. He estimated that, because of her continuing physical deterioration, Ms. Dennis could probably work for only three to five more years.
Our review of the evidence convinces us that the trial court's award of $300,000 to Ms. Dennis is not an abuse of discretion, given her multiple injuries. Her knee injury was quite severe, necessitating removal of part of the kneecap, two corrective surgeries, and extensive physical therapy. Despite these rehabilitative efforts, *40 Ms. Dennis was left with a permanent 20% disability for the affected leg. The fractures in her hand also required surgical repair and she has permanent implanted screws and a metal plate, which cause her discomfort. She has diminished grip strength in her hand as a result of her injuries. She has lower back and hip problems that began after the accident, when her ability to walk was hampered by her knee injury. Perhaps most significantly, she suffered a ruptured spleen, which had to be removed. Based on the case law we reviewed, the loss of this organ is considered a major life-altering problem because of the potential for serious infections. The general damages in this and other splenectomy cases reflect the seriousness of this loss. Therefore, considering the ruptured spleen in addition to her other injuries and complications, we conclude the award of $300,000 was well within the trial court's discretion.

Damages for Loss of Future Earning Capacity Applicable Law
Awards for lost future income are inherently speculative and are intrinsically insusceptible of being calculated with mathematical certainty. Therefore, the trier of fact is given much discretion in fixing these awards. Hollenbeck v. Oceaneering Int'l, Inc., 96-0377 (La.App. 1st Cir.11/8/96), 685 So.2d 163, 175, writ denied, 97-0493 (La.4/4/97), 692 So.2d 421. When reviewing a trial court's award for loss of earning capacity, an appellate court should give deference to the trier of fact. Jackson v. Frisard, 96-0547 (La.App. 1st Cir.12/20/96), 685 So.2d 622, 629, writs denied, 97-0193, 97-0201 (La.3/14/97), 689 So.2d 1386 and 1387. An award of loss of future income is not based upon the difference between a plaintiff's earnings before and after a disabling injury. Rather, the award is predicated upon the difference between a plaintiff's earning capacity before and after a disabling injury. Birdsall v. Reg'l Elec. & Constr., Inc., 97-0712 (La. App. 1st Cir.4/8/98), 710 So.2d 1164, 1170.

Ms. Cassisa's Damages for Loss of Future Earning Capacity
Kenneth J. Boudreaux, Ph.D., performed an analysis of Ms. Cassisa's loss of future earning capacity. He expressed his results in terms of past and future "present value factors," which could be used by the trier of fact to calculate the present value of any particular annual loss for the duration of work life. For instance, if the court determined the annual loss was $1,000, the present value of that amount over Ms. Cassisa's work life expectancy would be $18,040 pretax. His analysis was not expressed in terms of whether these amounts would be contingent upon Ms. Cassisa's ability to earn a college degree or professional certification of any kind.
Another economist, G. Randolph Rice, Ph.D., prepared a letter report concerning Ms. Cassisa's loss of earning capacity. Assuming that "but-for-the-accident Ms. Cassisa would have completed a college degree," he assigned $25,000 as an annual income for entry-level college graduates in non-specialized areas of study, and used this amount as the benchmark income for his computations. He applied an average annual rate of growth of 4.5%, and discounted the future earnings by 6.5% to account for the fact that the funds would be paid now, rather than over a course of years. A statistical model suggested she would have 28.53 subsequent years of work-life expectancy, during which time she could earn $545,697. If she worked without interruption until age sixty-two, she could make $657,661. Assuming she were unable to work, all of this potential income would be lost. If she could work at a lesser rate of pay, her work-life loss of earnings would be less. If she could work *41 at minimum wage, a growth rate of 3.5% would be appropriate and she could make $206,013 over 28.53 years and $240,912 over 36.93 years. Thus, her net future discounted wage losses would be between $339,684 and $416,749. When asked if his projections would differ for a person who lost the capacity to become a CPA, Dr. Rice responded in the negative; entry-level salary for accountants fell between $23,000 and $28,200, so his $25,000 benchmark was still applicable.
In an addendum based on Dr. Gorman's estimate that if she did not earn her degree, Ms. Cassisa could continue full-time employment at her present wage of $5.91 per hour, Dr. Rice projected the net future discounted wage loss for 28.53 years would be $309,282, and for 36.93 years, the loss would be $381,197. An additional factor to consider, were she unable to get her degree, was the potential loss of medical benefits, the average annual value of which is $3,262. This would increase her loss by $71,702 over 28.53 years, and $85,812 over 36.93 years. All of these figures in Dr. Rice's report were based on the assumption that, because of the accident, Ms. Cassisa had lost the ability to earn a college degree.
Because the evidence does not support this assumption, we conclude the trial court was manifestly erroneous in assigning any value to this claimed item of damages. The hypothesis upon which Dr. Rice based all his estimates was that Ms. Cassisa could no longer earn her undergraduate degree, and would therefore be limited to lower wage employment. However, our review of the evidence shows that all of the experts who treated, examined, and evaluated her said she could complete her college education and get a degree. Some thought she would need special assistance, others believed she would have to get her degree in a less challenging area than accounting, but not one of them said she had lost the ability to earn a college degree as a result of this accident. Therefore, there is no factual support for an award of lost earning capacity. Dr. Boudreaux made no conjecture about whether any amount would actually be lost, but merely assigned a present value to whatever annual amount the court might conclude Ms. Cassisa had lost. The trial court's award of $416,749 is the amount projected by Dr. Rice, assuming Ms. Cassisa could not get her college degree and would only earn minimum wage over a work-life expectancy of 36.93 years. The record shows that as a result of Ms. Cassisa's successful mental and physical rehabilitation, she has not lost the capacity to earn future income at the same level she could have before the accident. This award is not justified by the facts in this case, and must be reversed.

Ms. Dennis's Damages for Loss of Future Earning Capacity
The same two economists projected Ms. Dennis's loss of future earning capacity. Dr. Rice indicated her future work-life expectancy at age 47 was 11.68 years, based on a standard statistical model. However, this model did not take into consideration the possibility of uninterrupted work until age 62, in which case Ms. Dennis's work-life expectancy was 14.56 years from the trial date. Dr. Rice applied a growth rate of 3% and discounted the future earnings potential by 6% to arrive at his projections. Based on the information provided to him, he concluded Ms. Dennis had been earning $200 to $300 per week, or approximately $12,500 per year before the accident. Her future earning capacity at this rate would be $122,270 for 11.68 years of work-life expectancy and $146,625 for 14.56 years of work-life expectancy. Assuming she could only make one-half that amount after the *42 accident, her lost future earning capacity would be between $61,135 and $73,312.50.
Dr. Boudreaux also performed an analysis in December 1997. He computed Ms. Dennis's work-life expectancy as 15.63 years at the accident date and 8.46 years at December 8, 1997, when his report was written. Dr. Boudreaux stated that the best evidence of an individual's earning capacity at accident date is usually the past history of income to that point. Therefore his report used the term "income base" synonymously with "earning capacity." However, he noted that he had not been provided with the best records of her past earnings, which would be income tax returns. Therefore, one projection used the $12,500 annual income base provided by Dr. Rice. An alternative projection produced the results of "present value factors," which the court could apply to any annual wage loss it determined from the facts.
The assumptions provided to Dr. Boudreaux were that Ms. Dennis was capable of earning full-time minimum wage since March 1992, when Dr. Butler said she could work within certain limitations, and that she could earn full-time minimum wage in the future. Dr. Boudreaux applied an increase rate of 2% to 5%, and used a discount rate of 5.85%. Using Ms. Dennis's past income base as a predictor of her future earning capacity, he determined that if her past pretax annual income base was $12,500 and she only earned minimum wage in the future, her lost future earning capacity would be between $12,720.69 and $14,513.63 pretax. If the $12,500 annual income was after taxes, her lost future earning capacity, after taxes, would be between $10,047.64 and $11,472.32. In the alternative, Dr. Boudreaux provided a set of "present value factors." Using this method, for any $1,000 of lost annual earning capacity determined by the court, the present discounted value of that amount for Ms. Dennis's work-life expectancy would be $7,620.
Examining the trial court's award of $132,402 for Ms. Dennis's lost future earning capacity, we are forced to conclude that there is no basis for an award of this amount in the record. The court apparently based this on Dr. Rice's estimate of the present value of her future earning capacity without injury, which was between $122,270 and $146,625. This is the range of loss if she were unable to return to work. However, even Dr. Gorman, the most pessimistic of those who evaluated her future work possibilities, did not say that Ms. Dennis was totally unable to return to any kind of employment. Therefore, adjusting this award to the highest reasonable amount suggested by the economists, this court awards $73,312.50 for Ms. Dennis's lost future wage earning capacity.

REDUCTION FOR LOST CONTRIBUTION RIGHTS
DOTD claimed it was entitled to reduce its payments to Ms. Cassisa and Ms. Dennis by the 15% fault attributed to the settling tortfeasor, The Finish Line. Because we have determined the trial court erred in assigning fault to The Finish Line, this argument is no longer applicable as to this party. However, we note that Ms. Dennis settled and dismissed all her claims against Ms. Cassisa, her parents, and her insurers before trial. Therefore, the legal issue is still extant, this time in terms of whether DOTD is entitled to reduce its payment to Ms. Dennis because it lost its right to get contribution from Ms. Cassisa. Because this issue was the cause of considerable controversy, prompting a "clarifying judgment" in the trial court, and was briefed extensively in this *43 appeal, we consider it in the context of Ms. Dennis's settlement with Ms. Cassisa.[15]
At the time of the accident, Louisiana Civil Code article 2324(B) provided, in pertinent part, as follows:
If liability is not solidary pursuant to Paragraph A, or as otherwise provided by law, then liability for damages caused by two or more persons shall be solidary only to the extent necessary for the person suffering injury, death, or loss to recover fifty percent of his recoverable damages; however, when the amount of recovery has been reduced in accordance with the preceding Article, a judgment debtor shall not be liable for more than the degree of his fault to a judgment creditor to whom a greater degree of fault has been attributed. Under the provisions of this Article, all parties shall enjoy their respective rights of indemnity and contribution.[16]
In Touchard v. Williams, 617 So.2d 885 (La.1993), the supreme court interpreted Article 2324(B) to mean that, except for tortfeasors whose liability is greater than 50%, each tortfeasor is solidarily liable for 50% of the plaintiff's recoverable damages. There the trial court had allocated fault 63% to one tortfeasor, 30% to a second, and 7% to a third, and awarded $100,000 damages to the plaintiff. After the trial, the plaintiff was paid $25,000 by the first tortfeasor, $30,000 by the second, and $7,000 by the third. Because she had already recovered over 50% of her total damage award, the lower courts found she was not entitled to collect anything more. The supreme court disagreed, allowing her to collect additional amounts up to 100% of the judgment. However, each joint tortfeasor's exposure was limited to 50% of the plaintiff's recoverable damages, unless that tortfeasor was allocated greater than 50% fault. This court followed that rationale in Batson v. South Louisiana Med. Ctr., 97-1382 (La.App. 1st Cir.9/25/98), 724 So.2d 782, 787-88, writ granted in part and otherwise denied, 698-2709 (La.1/8/99), 734 So.2d 649,[17] concluding that the plaintiff could collect 50% from one joint tortfeasor and 50% from another joint tortfeasor, until the plaintiff had recovered 100% of her damage award.
In cases in which the plaintiff has been assigned a percentage of fault, the "recoverable damages" are the total award, reduced by the plaintiff's percentage of fault. LSA-C.C. art. 2323;[18]see Ehrman v. Holiday Inns. Inc., 94-0312 (La.App. 4th Cir.3/29/95), 653 So.2d 732, 741, writs denied, 95-1051, 95-1058 (La.6/16/95), 655 So.2d 343. The doctrine of contribution serves to mitigate the harsh effects of solidary liability by permitting a tortfeasor who has paid more than his share of a solidary obligation to seek reimbursement from the other tortfeasors for their respective shares of the *44 judgment. LSA-C.C. art. 1804. The source of the right to claim contribution is subrogation to the plaintiff's rights against the remaining tortfeasors. Farbe v. Casualty Reciprocal Exch., 00-0076 (La.7/6/00), 765 So.2d 994, 996. When a plaintiff settles with and releases one of several joint tortfeasors, he deprives the remaining obligors of the right to contribution against the released obligor. Taylor v. United States Fidelity & Guar. Ins. Co., 630 So.2d 237, 239 (La.1993). Among solidary obligors, each is liable for his virile portion. If the obligation arises from an offense or quasi-offense, a virile portion is proportionate to the fault of each obligor. LSA-C.C. art. 1804. A plaintiff's settlement with one solidary obligor reduces his recovery against the remaining obligors by the amount of the released obligor's portion of the debt. Judgments are reduced in proportion to the percentage of fault allocated to the released tortfeasor. Farbe, 765 So.2d at 997.
In the recent Farbe case, the supreme court considered whether DOTD was entitled to receive a credit against the judgment in accordance with the 80% of fault assigned to the released tortfeasor (Beaver), or whether DOTD was solidarily liable for 50% of the judgment. The court noted that if there had been no settlement with Beaver, DOTD would have been solidarily liable for 50% of the plaintiff's recoverable damages, but would have been entitled to seek contribution from Beaver for the 30% of that payment that was properly Beaver's share. The court held that because the plaintiff's settlement deprived DOTD of the right to enforce contribution against Beaver, the effect of the settlement was to reduce the amount of recoverable damages against DOTD, leaving it liable for only 20% of those damages.
Our research has not disclosed any cases in which the settling tortfeasor was liable for less than 50% of the plaintiff's damages, as in this case. Article 2324(B), as interpreted by Touchard and Batson, requires any joint tortfeasor whose liability is less than 50% to bear solidary liability up to that amount. Therefore, when one of three tortfeasors is insolvent or otherwise unavailable to pay its percentage of fault, the other two, each of whose fault is less than 50%, are each liable for up to 50% of the plaintiff's recoverable damages. The fact that one of these has settled before trial means that the plaintiff can no longer recover anything from that party, from whom she could have recovered 50% of her damages. Thus, the plaintiff bears the loss of whatever percentage is attributable to that party, as if that amount had already been paid. Whether the settling tortfeasor's settlement is used to reduce the total award by 15% or 50% is irrelevant; either way, the other tortfeasor is still liable for the other 50%. To conclude otherwise would controvert the 50% solidary liability imposed by Article 2324(B), as interpreted by the supreme court in the Touchard case.
Applying this rationale to the cases we are reviewing, we note that if Ms. Dennis had not dismissed her claims against Ms. Cassisa before trial, Ms. Cassisa would have been solidarily liable with DOTD for 50% of Ms. Dennis's damages. Under the facts before us, the party to whom 70% of the fault has been allocated, Mr. Givens, is not likely to be a source of payment to Ms. Dennis. Thus Ms. Dennis could have collected 50% of her damages from Ms. Cassisa and another 50% from DOTD. By settling with Ms. Cassisa, Ms. Dennis has forfeited the right to collect 50% of her damages. This does not affect DOTD's solidary liability for the payment of the other 50% of her damages. This result is consistent with the supreme *45 court's rationale in the Farbe case, because if there had been no settlement with Ms. Cassisa, she would have paid 50% of Ms. Dennis's damages and DOTD would still have been responsible for 50%.
Accordingly, we conclude that DOTD is solidarily liable for 50% of Ms. Dennis's damages, and the award is not to be reduced by any percentage of fault due to the pre-trial settlement of her claims with Ms. Cassisa.

CONCLUSION
Based on the foregoing, the portion of the judgments of the trial court allocating fault to The Finish Line is reversed, and judgments are rendered in both cases allocating fault 15% to Ms. Cassisa, 15% to DOTD, and 70% to Mr. Givens.
The judgment in the Dennis case is amended to provide that DOTD is solidarily liable to Ms. Dennis for up to 50% of her recoverable damages, which are $565,274.91;[19] Mr. Givens is liable for 70% of that amount. In all other respects, the trial court judgment in the Dennis case is affirmed.
The judgment in the Cassisa case is reversed as to the award of damages for loss of future earning capacity. The judgment is amended to provide that DOTD is solidarily liable to Ms. Cassisa for up to 50% of her recoverable damages, which are $1,261,877.50;[20] Mr. Givens is liable for 70% of that amount. In all other respects, the trial court judgment in the Cassisa case is affirmed.
The costs of this appeal, in the amount of $5,379, are to be shared equally by Ms. Cassisa and DOTD.
REVERSED AND RENDERED IN PART; AMENDED IN PART AND, AS AMENDED, AFFIRMED.
KUHN, J., dissents and will assign reasons.
CARTER, C.J., concurs in part and dissents in part for reasons assigned.
CARTER, J., Concurs in Part and Dissents in Part.
I agree with that part of the majority opinion that affirms the trial court and disagree with the majority opinion insofar as it reverses the allocation of fault to The Finish Line and reduces and/or eliminates the various awards of damages. However, I agree with the majority opinion insofar as it interprets and correctly applies Farbe v. Casualty Reciprocal Exchange, 00-0076 (La.7/6/00), 765 So.2d 994.
KUHN, J., dissenting in part.
I disagree with the majority's reversal, in its entirety, of the award to Ms. Cassisa for her loss of future income. Awarding Ms. Cassisa an amount for loss of future income should not depend on whether she graduates from college. The majority's reiteration of the evidence certainly establishes she proved a loss of future earning capacity. Dr. Cornelius Gorman, accepted by the trial court as an expert in the field of vocational counseling, rehabilitation and evaluation, testified that Ms. Cassisa does *46 not, and will not be able to, function intellectually as she did before the accident. He stated that her IQ dropped from a range of between 121-125 to around 100, relying on her pre-accident ACT score of 28 to support his conclusion. Dr. Gorman indicated that Ms. Cassisa will probably make $5.15/hour and may not be able to be a proprietor of a business. Having studied and analyzed the Louisiana Rehabilitation Services' opinions and materials as part of his review of Ms. Cassisa, Dr. Gorman placed Ms. Cassisa in the category of "severely disabled perpetual."
Quoting from Hollenbeck v. Oceaneering Int'l, Inc., 96-0377 (La.App. 1st Cir.11/8/96), 685 So.2d 163, 175, writ denied, 97-0493 (La.4/4/97), 692 So.2d 421, the majority opinion duly notes, "Awards for lost future income are inherently speculative and are intrinsically insusceptible of being calculated with mathematical certainty." And citing Birdsall v. Regional Elec. & Const., Inc., 97-0712 (La.App. 1st Cir.4/8/98), 710 So.2d 1164, 1170, the majority correctly state that an award of loss of future income is not based upon the difference between plaintiff's earnings before and after a disabling injury. Rather, the award is predicated on the difference between plaintiff's earning capacity before and after the disabling injury. Nevertheless the majority concludes Ms. Cassisa is not entitled to any amount for her loss of future income.
There is substantial, even vast, evidence to suggest Ms. Cassisa's future earning capacity has been affected by this accident. And while I agree a downward adjustment of the trial court's award of $416,749 on this element of damages is warranted, I simply cannot agree with a reversal of this award in its entirety. Accordingly, I dissent from that portion of the majority opinion which concludes Ms. Cassisa is entitled to no award for her loss of future income.
NOTES
[1] The Finish Line is an off-track betting facility and bar on U.S. Highway 11 outside of Slidell, Louisiana.
[2] Mr. and Mrs. Dennis were divorced while this lawsuit was pending and, because Mr. Dennis did not participate in any of the proceedings, his loss of consortium claims were dismissed by the court.
[3] The correct name of this defendant is Jefferson Downs Corporation, d/b/a The Finish Line.
[4] Neither Mr. Givens nor any insurer represented his interests at the trial; he apparently was uninsured.
[5] According to her brief, Ms. Cassisa settled with The Finish Line for $56,950.50. The record and briefs do not indicate the amount of Ms. Dennis's settlement with The Finish Line.
[6] In Keith v. United States Fid. & Guar. Co., 96-2075 (La.5/9/97), 694 So.2d 180, the supreme court decided that the 1996 amendment to Article 2323 should be applied retroactively. Therefore, the court in these cases had to assess the fault of all parties, including any immune parties.
[7] No one contested the assignment of 5% fault to Ms. Cassisa.
[8] In 1996, the legislature enacted Louisiana Civil Code article 2317.1, which effectively abolished the concept of strict liability by requiring that the owner or custodian of a defective thing must have actual or constructive knowledge of its dangerous propensity and failed to take reasonable preventive measures. Because this was a substantive change in the law, it is applicable only prospectively. LSA-C.C. art. 6; Jackson v. Beasley, 30,359 (La.App. 2nd Cir.4/8/98), 712 So.2d 162, 166.
[9] Neither Ms. Cassisa nor her other passenger, Kelly Walgamotte, had any recollection of the accident or the events immediately preceding it, except that Mr. Walgamotte remembered seeing headlights coming directly toward them.
[10] AASHO is an acronym for the American Association of State Highway Officials. The name of the association was later changed to the American Association of State Highway and Transportation Officials, or AASHTO.
[11] In written reasons for judgment, the court also stated the following concerning punitive damages under Louisiana Civil Code article 2315.4 for injuries attributable to intoxicated drivers:

Plaintiffs have not proven by a preponderance of the evidence that the injuries on which their actions are based were caused by a wanton or reckless disregard for the rights and safety of others by a defendant whose intoxication while operating a motor vehicle was a cause in fact of the resulting injuries. Therefore, the Court awards no damages for such a claim.
[12] There is a line of cases suggesting that, when a court has erroneously allocated fault to a party, the reallocation of fault among the remaining tortfeasors should be accomplished by using a "ratio approach," first described in Guidry v. Frank Guidry Oil Co., 579 So.2d 947 (La.1991), and cited with approval in Cavalier v. Cain's Hydrostatic Testing, Inc., 94-1496 (La.6/30/95), 657 So.2d 975, 982. See Duplantis v. Danos, 95-0545 (La.App. 1st Cir.12/15/95), 664 So.2d 1383, 1391; Couvillion v. Shelter Mut. Ins. Co., 95-1186 (La.App. 1st Cir.4/4/96), 672 So.2d 277, 281. We have re-apportioned fault in this case in accord with the standard set out by the Louisiana Supreme Court in Clement, 666 So.2d at 611, and followed by this court in Barsavage, 686 So.2d at 962 and Lee, 751 So.2d at 325. Although the cases are difficult to distinguish, it appears the "ratio approach" was only applied when fault was allocated to a non-party or immune party in the period before Louisiana Civil Code article 2323 was amended in 1996 to require quantification of such parties' fault, and/or before the Louisiana Supreme Court decided in Keith, 694 So.2d at 183, that the amendment to Article 2323 was to be applied retroactively. Therefore, we have used the re-allocation formula described in the later cases.
[13] She explained at trial that she could not get to school for her exams because her car had been flooded by a hurricane. A professor whom she telephoned told her if she did not take the exams, she would get a failing grade. She did not contact her other professors.
[14] Reading the depositions of the two vocational rehabilitation experts, it is difficult to believe they both examined the same woman.
[15] There is nothing in the record or briefs of the parties concerning the amount of this settlement.
[16] This Article has since been amended to eliminate all solidary liability except for intentional torts, but this being a substantive change in the law, it is not retroactive. See Aucoin, 712 So.2d at 67.
[17] The supreme court granted writs only to delete the $10,000 attorney fee award. In all other respects the writ was denied.
[18] In the version applicable to this case, Article 2323 stated, in pertinent part:

If a person suffers injury, death or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the claim for damages shall not thereby be defeated, but the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death or loss. (Emphasis added).
[19] This amount reflects the reduced award for loss of future earning capacity, which the trial court had set at $132,402.00, and this court has reduced to $73,312.50, a difference of $59,089.50.
[20] This amount reflects the elimination of the award for loss of future earning capacity, which the trial court had set at $416,749. When the total award is reduced to reflect this difference, it is $1,484,561.77, and when further reduced by $222,684.27 to account for Ms. Cassisa's percentage of fault (15%), the recoverable damages are $1,261,877.50. Mr. Givens is liable for 70% of this amount. DOTD is liable for 15% of this amount, but is solidarily liable for up to 50% of this amount.